STATE to use MAYER, Appellant, v. O' NEILL et al.

### Division Two, June 26, 1899.

1. **Practice:** THEORY OF TRIAL: PARTY ADMITTED TO BE CREDITOR. Where, on a trial, parties to an action by their conduct and theory of trial concede that the opposite party is a creditor of a mortgagor through whom the former claim, they can not on appeal claim that the latter have failed to show that they were creditors.

2. ———: CLAIMANT UNDER CHATTEL MORTGAGE: BURDEN. One claiming under a chattel mortgage, or basing an action thereon, has the burden of showing every fact on which its validity depends.

3. **Attachment:** JUSTIFICATION FOR SHERIFF. A writ of attachment regular on its face, if issued out of a court of competent jurisdiction, is a sufficient justification to a sheriff for taking possession of property thereunder; and he need not concern himself in regard to the legality of the claim on which it is issued.

4. ———: CHATTEL MORTGAGE: WITHHELD FROM RECORD BY AGREEMENT. A chattel mortgage withheld from record, pursuant to an agreement between the mortgagor and mortgagee, for the purpose of fostering the mortgagor's credit, is fraudulent in fact, and void as to creditors who give the mortgagor credit on the faith of his apparent solvency, though there may not have been any actual intent to hinder, delay, or defraud his creditors.

State to use v. O'Neill.

5. ——: ——: ——: ——: POSSESSION BY MORTGAGEE. Taking possession of mortgaged property by a mortgagee operates to make valid, between the mortgagor and mortgagee, a mortgage which by its terms or collateral agreement permits the mortgagor to retain possession and sell the mortgaged property as his own, and which would otherwise be void.

6. ——: ——: AGREEMENT BETWEEN AGENT OF BONA FIDE AND FRAUDULENT MORTGAGEE. Where the attorney of a mortgagee having a valid lien on chattels enters into an agreement with one whose mortgage is fraudulent, to take possession of the mortgaged goods, and to make common cause against the creditors of the mortgagor, and to divide the proceeds among themselves equally, regardless of their respective claims, and that, in case only one of them should succeed in establishing a right to the goods under his mortgage, then he should have all of the same, operates to render the otherwise valid mortgage fraudulent as to the creditors, as tending to hinder, delay, and defraud them.

*Appeal from Jackson Circuit Court.*—Hon. J. H. Slover, Judge.

Affirmed.

Botsford, Deatherage & Young for appellant.

(1)   Defendants having wholly failed to make any proof that any of the attachment plaintiffs were creditors of Chas. Johns, and there being nothing in the record to show that Chas. Johns ever became or was indebted to any of said attaching plaintiffs, it results that neither said attaching plaintiffs nor said defendants claiming under them have any right to question the good faith of the chattel mortgage from defendant to plaintiff. (Clark v. Laird, 60 Mo. App. 289.) It follows that for this reason, and aside from all the other points we contend for, the court below erred in peremptorily instructing the jury to return a verdict for the defendants, and also erred in not giving the instructions prayed for by plaintiff, numbered 1, 2 and 3.   State ex rel. v. Rucker, 19 Mo. App. 592; Shoe Co. v. Bain, 46 Mo. App. 582.   (2)   The mortgage of Chas. Johns to the Union National Bank, if

valid at all, was only valid to the extent of the goods covered by that mortgage at the time that mortgage was made. The language of the description did not include any part of the stock of goods owned by Johns in No. 538 Main street, which last stock of goods, three months thereafter, he moved into No. 536, and consolidated it with the Deemer stock, nor did it include any of the goods added by purchase by Johns to the consolidated stock. Fleming v. Graham, 34 Mo. App. 160; Cobbey on Ch. Mort., sec. 356; Mackey v. Jenkins, 62 Mo. App. 621. (3) The language of the mortgage from Chas. Johns to the plaintiff, wherein the mortgage from Johns to the bank is recited, is as follows: "All subject however, to the rights of the Union National Bank of Kansas City, Mo., as its mortgage interest may appear under a chattel mortgage heretofore executed by me to said Union National Bank for the purpose of securing a note for $3,500." The plaintiff by that recital only became bound so far as the bank was concerned "as its mortgage interest may appear." In other words, if the mortgage to the bank was valid then the plaintiff by that recital became bound by that mortgage to the bank to the extent that it covered the mortgaged property. She was not prevented by the recital in her mortgage from showing or maintaining that the mortgage to the bank was invalid. Brooks v. Owens, 112 Mo. 251. (4) The bank, after possession was taken by the plaintiff, was suffered by the plaintiff to go in possession under its, the bank's mortgage, but that possession by the bank was taken without the knowledge or consent of Chas. Johns. If Johns had turned over possession to the bank while he was still in possession, then the bank would have acquired, by virtue of that delivery of possession alone and irrespective of the mortgage, an interest in the mortgaged goods by way of pledge or payment of its debt. There is nothing however in the record to show that Johns' consented to or was in anywise a party to the delivery of possession to the bank under its mortgage, and this being so, that possession

State to use v. O'Neill.

obtained by it without Johns' consent, gave the bank no interest under its void mortgage.    Stephens v. Perrine, 143 N. Y. 476.    (5)    The proof in this case on the part of the plaintiff, of the mortgage to her, that she was put in possession of the mortgaged property; that defendants thereafter took possession of the same under writs of attachment, and the proof of the value of the property, made out a case for the plaintiff entitling her to recover.    Janssen v. Stone, 60 Mo. App. 402.

LATHROP, MORROW, FOX & MOORE, ALEXANDER NEW, HENRY WOLLMAN, HAFF & VAN VALKENBURGH, J. W. GARNER, M. R. DOWNS and L. A. LAUGHLIN for respondents.

The mortgage given by Johns to the appellant, Mayer, and the subsequent acts of her agent, Young, operated, and were intended to operate to hinder and delay the creditors of said Johns in the collection of their claims.    The said Young, as agent of the mortgagee Mayer, was fully cognizant of the fraud which tainted the mortgage to the Union National Bank, when he undertook to preserve the bank's security to the bank and place it beyond the reach of other creditors. These facts were clear, and the testimony establishing them uncontradicted and incontrovertible, and their effect was so certain that there was nothing for the trial court to do but to peremptorily instruct the jury to find for the defendants. This is the law, as declared in the case of Williams v. Kirk, 68 Mo. App. 547, in an admirable opinion, citing the case of Barton v. Sitlington, 128 Mo. 164.    See, also, Perrine v. Bank, 55 N. J. L. 402; Seger v. Thomas, 107 Mo. 635; Bauer Grocer Co. v. Smith, 61 Mo. App. 665; McDonald v. Hoover, 142 Mo. 484.

BOTSFORD, DEATHERAGE & YOUNG for appellant in reply.

(1)    The fact that the mortgage to the bank was void down to the time of making the mortgage to plaintiff did not

disable Johns from giving a new mortgage to the bank at the same time of giving the mortgage to plaintiff, or from stipulating, as he did in the mortgage to plaintiff, for payment thereunder of the bank's mortgage debt. Greely v. Reading, 74 Mo. 309; Petring v. Chrisler, 90 Mo. 649; Dobyns v. Meyer, 95 Mo. 132. (2) Equally untenable is the contention of respondents' attorneys that the mortgage to plaintiff is rendered void by the written agreement made by plaintiff and the bank dated January 29, 1894. Said agreement was made after those levies to adjust the priorities and settle all questions between the plaintiff and the bank as to the division of the proceeds to which they should be held entitled from the mortgaged property.

SHERWOOD, J.—Action on sheriff's bond against the sheriff and his sureties, for the alleged wrongful seizure by the sheriff, O'Neill, under seven writs of attachment levied on certain personal property which Augusta Mayer claimed as hers by virtue of a certain chattel mortgage executed to her by one Johns on the 9th day of January, 1894. The validity of this mortgage is questioned by this litigation.

At the conclusion of the evidence the court gave a peremptory instruction to find for defendants, and plaintiff took a nonsuit with leave, etc., and having moved, and the motion being denied, excepted and appealed to this court.

Attention will now be directed to the salient features of this cause in order to determine whether the mortgage made by Charles Johns to his sister Augusta Mayer, was valid or not, because upon its validity rests the validity of the peremptory instruction aforesaid.

Intimately associated, however, with the Mayer mortgage is the prior one made to the Union National Bank of Kansas City, by Johns, and to which reference is made in the former but subsequent mortgage. The mortgage to Mrs. Mayer was given on the entire stock of shoes and fixtures at 536 Main street, Kansas City, Mo., as security for the sum of $4,270,

supposed to be evidenced by six promissory notes which are as follows:

'A'  Kansas City, Mo., July 13, 1885.

Due Mrs. Augusta Mayer five hundred dollars which is invested in the Little Venture Cattle Co., or due on demand with 60 days notice at 8 per cent from date. Two hundred dollars recd. in 1881 and three hundred dollars in 1883, total as the above stated $500. If left in the Little Venture Cattle Co. for investment she will receive her dividends as soon as any are made pr. ratio or draw her capital out as stated before in this.  Chas. Johns.

'B'  Kansas City, Mo., Nov. 30, 1886.

Due Augusta Mayer three hundred and fifty dollars with interest at the rate of 8 per cent pr. annum till paid.

$549.10  Chas. Johns.

'C'

$375.00  Kansas City, Mo., Aug. 12, 1887.

............After date I promise to pay to the order of Augusta Mayer three hundred seventy-five dollars. For value received, negotiable and payable without defalcation or discount, and with interest from date at the rate of 8 per cent per annum, and if the interest be not paid annually to become as principal and bear the same rate of interest.

$717.56  Chas. Johns.

'D'

$525  Kansas City, Mo., Nov. 9, 1888.

............After date I promise to pay to the order of Augusta Mayer six hundred twenty-five dollars. Interest of 8 per cent pr. annum. Value received.

Due $990  Chas. Johns.

'E'

$750  Kansas City, Mo., January 3d, 1890.

One year after date I promise to pay to the order of Augusta Mayer seven hundred fifty dollars. Interest of 8 per cent pr. annum. Value received.

Due $990  Chas. Johns.

B.  Glick bookseller and stationer, 535 Main St. Kansas City.

'F'

$290        Kansas City, Mo., October 16th, 1891.

One year after date I promise to pay the order of Augustus Mayer two hundred and ninety dollars.  For value received, negotiable and payable without defalcation or discount, and with interest from date at the rate of 8 per cent per annum, and if the interest be not paid annually to become as principal and bear the same rate of interest.

Due 343.85.                     Chas. Johns.

No payment had ever been made on these notes, and it was not until December 23d, 1893, that any attempt was made to collect the indebtedness represented by the notes.  Then J. L. Young was written to by Mrs. Mayer and the notes inclosed to him for collection.  Mrs. Mayer as well as Young and Johns had formerly lived in Decatur, Iowa, about 1866 or '67, but he had held no correspondence with her since 1870, until the letter aforesaid reached him at Garden Grove, Iowa, 185 miles from Kansas City.  Young, however, was well acquainted with Johns, used to visit him at Kansas City and had been his counsel in active litigation for three years. They were on intimate terms.

The mortgage to Mrs. Mayer, contains among other, these clauses:

"(All subject, however, to the rights of the Union National Bank of Kansas City, Mo., as its mortgage interest may appear, under a chattel mortgage heretofore executed by me to said Union National Bank for the purpose of securing a note for three thousand five hundred dollars).

"Upon condition, that if I pay to said Augusta Mayer, her executors, administrators and assigns, the full amount of the six promissory notes which are attached to this chattel mortgage and made a part hereof, together with the interest thereon, according to the tenor and effect of said promissory

notes from the several dates thereof, as shown by said notes, which are marked A, B, C, D, E and F and recorded herewith, then this conveyance shall be void; otherwise to remain in full force and effect. And in case default be made in the payment of the debt above mentioned or any part thereof, or of the interest due thereon, on any day when the same ought to be paid, then the whole sum shall, at the election of said Augusta Mayer or her agent or legal representative become immediately due and payable.

"The property hereby sold and conveyed to remain in the possession of said mortgagee, who may proceed to sell the same so long as it can be done without an unreasonable depreciation in the value of her security, and apply the proceeds realized therefrom, after paying reasonable expenses, in payment of the mortgage heretofore mentioned, and also to the payment of the indebtedness hereby secured, or upon taking possession of said property or any part thereof, either in case of default or as above provided, or at any time thereafter, the said Augusta Mayer, or her legal representative, may proceed to sell the same, or any part thereof, at public auction, to the highest bidder for cash, at said store room in the city of Kansas City, county of Jackson and State of Missouri, first having given 10 days public notice of the time, terms and place of sale, and property to be sold, by publishing notice thereof in the Kansas City Times for three consecutive days.

"I fully exonerate and hold said Augusta Mayer and her legal representatives and assigns harmless for any claim for trespass on account of entering said or any premises where said personal property may be and taking or causing to be taken the property herein mentioned. I further agree to protect said Augusta Mayer or assigns from any landlord's claim while engaged in the disposal of said goods. After said debt and interest together with all necessary costs, charges and expenses incurred by said Augusta Mayer or assigns, have been paid and satisfied in full out of the proceeds of such sale,

she or they will pay over the surplus, if any, to said Charles Johns, or his legal representatives."

The mortgage to the bank had been executed on the 11th day of March, 1893, and was made to Lewis, cashier, to secure the payment of $3,500, due in 90 days, and was on the entire stock of boots and shoes at 536 Main street. One clause in that mortgage is the following: "But if the said Charles Johns shall fail to make default in the payment of said indebtedness, or any part thereof, when the same shall become due and payable, or if he shall sell or attempt to sell, remove or attempt to remove, said property out of said store room at any time before said indebtedness is fully paid and discharged, whether the same be due or not, then it shall be lawful for the said Charles H. V. Lewis, cashier, or anyone in his name, to take possession of said property wherever it may be found, and sell the same in any manner he shall think fit," etc., etc.

Johns had been a customer of the bank some seven or eight years and had been, as was natural, a constant depositor in that institution. It had been agreed between Johns and the bank that the mortgage to the bank should not be put on record because it would hurt Johns' credit.

After giving this mortgage to the bank, Johns continued business at the old stand, and used a part of the money, it seems, obtained from the bank to buy out Deemer's stock of boots and shoes, located at 538 Main street, which was next door, and they brought goods from 538 to 536 Main street in small quantities from time to time from one store to the other until he finally put the whole thing together in one room which was 536 Main street. The final uniting of the two stocks of goods was about July, 1893. Meanwhile, with credit untarnished, Johns continued to buy and sell goods as had been his wont to do, without let or hindrance, and about a month before the 9th of January, 1894, had bought large stocks of boots and shoes in Chicago and elsewhere, and when the sheriff levied his writs of attachment, a trifle less than two-thirds of the goods

Johns had on hand were brand new goods, recently bought at Chicago and the East, his usual places of purchasing.

Deemer also had a mortgage on the goods of Johns, the entire stock, and was executed on the same day the mortgage to Mrs. Mayer was executed, and was given to secure notes of Johns to the amount of $1,514.06, dated April, 1893, and were due respectively in 11, 12 and 13 months after date. This mortgage is made subject to the rights of the bank and of Mrs. Mayer and contains a clause like the one in the mortgage to Mrs. Mayer, about the mortgagee remaining in possession, etc., but Deemer was not allowed to sell except under 15 days' notice, while the bank could sell under 10 days' notice. Nor could Deemer sell except when the debt or interest thereon fell due, which had not occurred and could not occur until the following spring.

Deemer's mortgage was drawn up by Young at the request of Johns and Deemer. Mrs. Mayer's mortgage was recorded at 2 o'clock p. m. on the day of its execution; that of the bank on the same day at 2:44 o'clock, and that of Deemer at 4:35 o'clock on the same day.

All of the goods whether bound by the bank's lien or not were thrown into hotch-pot, in the same store room, and were invoiced at the sum of $10,000, on the 10th of January, 1894. Even after the sheriff levied his writs, there were left in the store room goods to the amount at cost price of $3,500, which were afterwards sold off by those in charge. All of the mortgagees were placed at once in possession and custody of the goods, and Young, at Neal's suggestion, who was vicepresident of the bank, posted this notice at the front door of the store: "This stock of goods is in possession of the mortgagees under three mortgages, one to the Union National Bank, one to Augusta Mayer and one to Louis Deemer."

The name of J. L. Young, as agent of Mrs. Mayer, was subscribed to this notice. The goods thus left at the store and fixtures, were sold to Moats, and brought $1,345, and nearly all of this was placed in the bank to Young's credit.

Young also bought the Deemer notes, secured by mortgage, amounting to $1,514 for $500 cash. Young bought these notes thus cheaply, because he says "Deemer was very much dissatisfied with the transaction." It appears in evidence that the Deemer mortgage resulted in part at least, from Charles Johns having gratuitously given Deemer the mortgage to secure an indebtedness owing Deemer by Johns' deceased brother. Young also bought of Johns the notes executed to him by Moats for $1,500, which notes were given for a portion of the stock of goods in controversy. What Young paid for these notes does not appear.

Appended to the mortgage of Mrs. Mayer and recorded therewith, was the following affidavit:

"State of Missouri, ⎱
　　　　　　　　　⎰ ss.
County of Jackson. ⎰

"Charles Johns being duly sworn on his oath says that he is the legal and absolute owner of the personal property above described, and that the same is free from all claims and liens whatsoever except the mortgage mentioned in the foregoing instrument.　　　　　　　　　Charles Johns.

"Subscribed and sworn to before me this ninth day of January, 1894.

"(Seal.)　　　　　　G. H. Smith, Notary Public."

A similar affidavit was appended to Deemer's mortgage by Johns, and recorded with that instrument. When Moats bought the goods left after the others were seized under the attachment writs, he set up store himself, and sold them out, employing Johns to help him, giving him one-third net profits in the business for his assistance.

It it asserted by counsel for plaintiff that: "There is nothing, however, in the record to show that Johns consented to, or was in anywise, a party to the delivery of possession to the bank, under this mortgage, and this being so, that possession, obtained by it without Johns' consent, gave the bank no

interest under its void mortgage." This assertion is indorsed as true by counsel for defendants, and this too in the face of the undisputed testimony of Neal, vice-president of the bank, that the possession was obtained with the consent of Johns in the presence of Young, and that Johns at his, Neal's request, turned over to Neal the keys, with the distinct understanding, with Johns and Young, that the mortgages were to be satisfied out of the goods then in the store; the proceeds to go first in satisfaction of the bank's claim; then in satisfaction of Mrs. Mayer's claim, and last that of Deemer. On the 12th of January, 1894, Young sent a notice of the sale of the goods then in the store to the "Times," fixing the day of sale on the 27th of the then current month. This notice which first appeared on January 13th, stated that the sale of the stock of boots and shoes at 536 Main street, Kansas City, Mo., would be made by Young as agent of Mrs. Mayer, under a mortgage given by Johns to her, but that the sale would occur: "All subject however to the rights of the Union National Bank of Kansas City, Mo., as its mortgage interest may appear, under a chattel mortgage heretofore executed by the said Chas. Johns to said Union National Bank for the purpose of securing a note for three thousand five hundred dollars."

Meanwhile the defendant sheriff, began on the 13th day of January, the seizure of the goods in the store at 536 Main street, under the writs of attachment, and these seizures continued down to the 27th day of January above mentioned. Two days after the levy of the last writ of attachment, this agreement which was signed by Neal as vice-president of the bank, and Young as agent of Mrs. Mayer, recites that the bank held a note on Johns for $3,500 with interest secured by chattel mortgage on a stock of boots and shoes, etc., at 536 Main street, belonging to Johns, and Mrs. Mayer is the holder of notes aggregating $2,890 and interest secured also by Johns, the maker, by a chattel mortgage on the same stock of goods, etc., "and said parties on the 9th day of January,

1894, went into active possession of said property, and since the said 9th day of January, 1894, a large portion of said property has been taken from the possession of said parties by various creditors of the said Johns by legal process; that as there was some question between Mrs. Mayer and the bank as to the priority of their respective claims under their possession of the property and in order to adjust their rights between themselves and to make common cause against the other creditors, the bank and Mrs. Mayer should cause the balance of the mortgaged property to be sold under the Mayer mortgage and the proceeds deposited in the Union National Bank to the credit of J. L. Young; that both the bank and Mrs. Mayer should take legal steps for the purpose of contesting the rights of other creditors to all of said mortgaged property; that the proceeds of this litigation should be deposited in the said bank to Young's credit, whether these proceeds were realized by Mayer or the bank; that at the conclusion of the litigation the rights of Mrs. Mayer and the bank to the fund in the Union National Bank should be determined as follows: If Mrs. Mayer's claim was defeated and the bank's claim sustained, the bank should take all the property; if the bank's claim was defeated and Mrs. Mayer's claim was sustained, Mayer should take all of the fund. If the claims of both to the property were sustained the proceeds should be divided equally."

The foregoing is thought to constitute a sufficient resume of the prominent facts in this cause, which have been dug out of the abstract of record, with but slight assistance from counsel, who having tried the cause in the lower court, ought to have become sufficiently familiar with the main facts therein to have furnished this court with a reliable and complete statement of those facts, referring from time to time to the various pages of the abstract.

The names of those persons in whose favor the writs of attachment as mentioned in the petition of plaintiff are:

Leonard Atkinson & Co., Fargo & Co., Z. T. Lindsay, Phelps, Dodge & Palmer Co., Pingree & Smith, Dennis Brady and Blacker, Gerstle & Co.

During the trial in the lower court, plaintiff's counsel admitted that as to those persons, naming them as above, "the mortgage read in evidence, in favor of the Union National Bank, made by Johns was void, because of the fact that it was held from record, as stated in said answer. Plaintiff also admits, as stated in defendant's answer, that since the filing of his amended answer in this cause, a trial has been had between the Union National Bank as plaintiff, and the defendant O'Neil and others, in this court, and that said mortgage was declared and held to be void, as set up and averred in defendants' answer."

The above is a very comprehensive admission. In the first place, the admission that the mortgage made in favor of the bank was void as to the persons before mentioned, admits, not only that the mortgage was void as to such persons, but by necessary implication admits that such persons were creditors of Johns, for otherwise there would be neither force nor significance in such admission. It would be impossible that an instrument could be void as to a party to a pending litigation who had nothing at stake in such litigation. In the second place, aside from such admissions, there exists the independent presumption that parties to a record, are presumed to have been interested in the suit. [1 Greenlf. on Evid. (15 Ed.) sec. 19.] In no other way could the plaintiffs in the attachment suits be interested therein, except as the creditors of Johns. So that the contention of plaintiff that defendants have failed to establish that the parties suing out the attachments against Johns, were his creditors, falls to the ground; and therefore, defendants have the admitted and established right to question the good faith of the chattel mortgage from Johns to plaintiff. And a solemn admission made during the trial of a cause by the attorneys of record, as in this instance,

of the invalidity of the mortgage to the bank is equally as effective and potential, so far as concerns the purposes of the present suits, as though embodied in a judgment, and may be given in evidence, even upon a new trial. [1 Greenlf. on Evid., sec. 186.]

Besides, no question was raised in the court below that the plaintiffs in the several attachment suits were creditors of Johns; the cause was tried on that theory as is also shown by instructions 16 and 17 asked by plaintiff, in which plaintiff refers to the attaching creditors as the creditors of Johns, and it does not, therefore, lie in plaintiff's mouth to assert in this court for the first time anything to the contrary of what was virtually and tacitly conceded in the trial court. This principle finds apt and frequent illustration in this court as well as elsewhere.

In Bray's Admr. v. Seligman's Admr., 75 Mo. 31, a motion had been filed for judgment against a stockholder in an insolvent corporation. On appeal, it was contended that there was no evidence of such insolvency. But the court said: "At the trial such insolvency was tacitly conceded. This being the case, it is quite too late to raise an objection on this score now."

"Parties lititgant are not allowed to trifle with the court or with each other; they are not allowed to assume inconsistent positions. Having made their election, and thereby caused their adversary to elect to pursue a certain course, they can not, after such a course has been pursued at their instance, take advantage of it, deny its validity, and thus 'tread back and trip up the heels' of their adversary." [McClanahan v. West, 100 Mo. loc. cit. 322. See, also, Walker v. Owen, 79 Mo. 563; Bensieck v. Cook, 110 Mo. 173; Fearey v. O'Neill, 149 Mo. 467; Epperson v. Postal Tel. Cable Co., 50 S. W. Rep. (Mo.) 795; 1 Elliott Gen. Prac., sec. 140.]

But more than all the above is the fact that plaintiff holds the affirmative. The same rule prevails with us as in the

Roman law, where it finds expression in the maxim: *"Ei incumbit probatio, qui dicti, non qui negat."* In a recent edition of a text book of recognized merit, it is said: "The best tests for ascertaining on whom the burden of proof lies are, to consider first which party would succeed if no evidence were given on either side; and, secondly, what would be the effect of striking out of the record the allegation to be proved. The onus lies on whichever party would fail, if either of these steps were pursued." [1 Taylor, Evid.; Chamberlayne's Notes, sec. 365.]

He who relies upon a chattel mortgage and bases his action thereon, is presumed to be prepared to show it was made in good faith, and for an honest purpose, and valid in other respects. [Strohm v. Hayes, 70 Ill. 41.]

And so also is the burden upon him who claims under a chattel mortgage, to show any delivery or change of possession of the things mortgaged, etc., which may be necessary to make the mortgage valid. [McCarthy v. Grace, 23 Minn. 182; 2 Cobbey Ch. Mort., sec. 756.]

Moreover, in this instance the writs of attachment are alleged in plaintiff's petition to have been issued from the clerk's office of the circuit court of Jackson county; this being the case, it will be presumed that such writs were fair on their faces, and where this is so and they issue from a court of competent jurisdiction, as is plainly the case here, they afford a full protection to the officer in so far as concerns any trespass committed in their mere levy on the property attached; and in such case the writ, fair on its face, etc., is all that the officer has to look to. [Rousey v. Wood, 47 Mo. App. loc. cit. 472 and cases cited.] When such appears to be the process, he is not concerned with any illegalities that may exist anterior to its issuance. [Cooley on Torts (2 Ed.), 538.] Nor does it concern the officer whether the claim presented by the writ he levies is valid or not, nor can it be thus

collaterally tried.   [Lashus v. Matthews, 75 Me. 446; Murfree on Sheriff's (New Ed.), sec. 950.]

If, however, the officer who has levied the writ does not rest content with simply seeking to excuse a trespass, but becomes an actor, seeks to recover in replevin or to have a return of the property, there, he must make a good title in *omnibus*.   In these things consist the salient differences between a jurisdiction under process regular on its face (which is a rule of protection merely for the officer), and one where the officer attempts to build a title upon such process; in the latter case, he  must show a foundation for the writ.   [Alderson on Jud. Writs & Proc., p. 459; Brown v. Bissett, 21 N. J. L. loc. cit. 52, and cases cited.]

The case just cited is followed with approval in Clarke v. Laird, 60 Mo. App. 289, which latter case is relied on by plaintiff.   But in the case at bar, the defendant sheriff while he justifies under the several writs of attachment, and charges the mortgage to the bank to be void as against the attaching creditors, and charges fraud and collusion as between the bank and plaintiff Mrs. Mayer, with intent to cheat and defraud the said attaching creditors as well as other creditors of Johns, yet the sheriff does not go further than this, he does not become an actor.   He could, so far as the fraud, etc., are concerned, have pleaded the general issue, and then under that plea have given the special matter in evidence showing the fraud, etc.   He was not required to show his hand, nor to disclose the grounds of his attack on the mortgage.   [Strohm v. Hayes, *supra*.]   These remarks, based upon the authorities aforesaid, seem to show the non-necessity of defendant sheriff relying upon anything more than his writs of attachment, fair on their faces.   Of course, nothing herein said is intended to intimate that a sheriff would be protected if he attached or levied on property as that of A, which really was the property of B, or on which the latter held a chattel mortgage against A as mortgagor.   [Murfree on Sheriffs (New Ed.), sec. 951.]

In such case, however, the plaintiff in order to disarm the officer of his protection afforded by the writ, must show such title in himself as would be effective against the defendant in the execution or process.    [Parker v. Walrod, 16 Wend. 514.]

Having disposed of the foregoing preliminary matters, I pass now to those which more closely concern the merits of this cause.    It will have been observed that the mortgages to Mayer and Deemer were verified by the affidavits of Johns. The statute does not require any such oath in cases of this sort, so that the unnecessary affidavits bring to mind the maxim: " '*Clausulae inconsuetae semper inducunt suspicionem.*' For, whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of transacting the business, apparently done with the view for effect and to give to the transaction an air of honesty, is of itself a badge of fraud. For, 'when the part is overacted the delusion is broken and the fiction appears.' (Comstock v. Rayford, 12 Sm. & Marsh, 369.)    This has been the rule ever since Twyne's case, 3 Coke 81, where it was held a circumstance · of grave suspicion that a clause in the conveyance recited that the gift was made honestly, truly and *bona fide.*    Bump, Fraud. Convey., 50 et seq., and cases cited."    [Baldwin v. Whitcomb, 71 Mo. loc. cit. 659.    To the same purport see Houts v. Shepherd, 79 Mo. loc. cit. 147; Hoge v. Hubb, 94 Mo. loc. cit. 503.]

But note another clause in the mortgage to Mayer which is out of the ordinary, because the possession in this case is expressly granted to the mortgagee, while the well settled law is that the first effect of giving a mortgage is the transfer of the title and right of possession in the thing mortgaged from the mortgagor to the mortgagee.    The right of possession follows the right of property.    This is always the result unless there is some restraining stipulation which prevents the mortgagee from taking possession until condition broken by the mort-

gagor.   [Jones, Ch. Mort. (3 Ed.), sec. 426; 1 Cobbey
Chat. Mortg., sec. 478; Johnson v. Simpson, 77 Ind. 412.]
So that the clause giving the mortgagee possession (if the
word be mortgagee, instead of a mere clerical error for mort-
gagor) is both unusual and unnecessary.   And it is difficult to
see, how the mortgagee could "remain in possession," if she
had not received possession until the execution of the mort-
gage.   Nor is it easily understood how the mortgagee while
in possession, could, by selling the goods herself, cause "an
unreasonable depreciation in the value of her security," espe-
cially so, as she was required by the clause, to apply the pro-
ceeds of such sales, after, etc., "in payment of the mortgage."
Nor with the mortgagee already in possession, is it easy to un-
derstand how she could subsequently take possession of the
property, etc., something of which, under the clause, she
already had possession.   If the word is to be construed as
meaning mortgagor, then the clause is readily understood, and
under our decisions, there would be nothing unlawful in the
mortgagor remaining in possession, and applying the pro-
ceeds in reduction of the mortgage debt.   But leaving this
point and turning to the mortgage made to the bank, it is dis-
closed by the evidence as already stated, that an agreement
existed between the bank and Johns that the mortgage to the
bank should not be put to record because doing this would in-
jure Johns' credit.   Such an agreement is fraudulent in fact.
This was so announced in Central Nat. Bank v. Doran, 109
Mo. 40, but the head note is misleading in stating that such
acts as before mentioned, would be "constructively fraudu-
lent."   In this connection it should be borne in mind that sub-
divisions 7 and 8 et seq. of section 521 of the Attachment act,
R. S. 1889, do not require that there should be a fraudulent
intent to "hinder, delay or defraud," in making the convey-
ance; it is the legal effect of that conveyance which the law
looks to; it suffices, therefore, that the result of the convey-
ance is either of those three forbidden things.   As is perti-

nently observed by RICHARDSON, J., in Reed v. Pelletier, 28 Mo. loc. cit. 177, "The term fraud as understood in the statute concerning fraudulent conveyances, has the same meaning in the attachment law, and it is not necessary to show that the act originated in any meditated design to commit a positive fraud or to injure other persons. There are many acts not the result of intentional fraud which the law, nevertheless, from their tendency to deceive other persons, or from their injurious consequences to the public, prohibits as being within the same reason and mischief as actual fraud. And whatever, by the judgment of the law, is denounced as fraudulent must be regarded in the same light in reference to an act or transaction which is made the ground of an attachment; and if the act charged to have been committed is fraudulent, actual or constructive, it will be inferred that the party intended its natural and ordinary results should follow."

In Michigan the same theory is prevalent, where the Supreme Court of that State in discussing the point here presented, say: "We have no doubt, that under our statutes any creditors have a right to avoid an unrecorded mortgage, who have, during its absence from the record, done anything material, which they may be fairly considered to have been done on the basis of its nonexistence." [Root & Co. v. Harl, 62 Mich. loc. cit. 422.]

An author of recognized merit says: "There is no difference in principle between fraud in fact and fraud in law. Where the direct and inevitable consequence of an act is to delay, hinder or defraud creditors, the presumption at once conclusively arises that such illegal object furnished one of the motives for doing it, and it is thus upon this ground held to be fraudulent. . . . . The statute refers to a legal and not a moral intent, for one man's right does not depend on another man's moral sense. The moral sense is much stronger in some men than in others. The statute, heretofore, supposes that everyone is capable of perceiving what is wrong, and if one

does what is forbidden, intending to do it, he is not allowed to say that he did not intend to do a forbidden act.  .   .   .   . Fraud, therefore, does not necessarily impute a corrupt or dishonorable motive.  .   .   .   . But the law does not sanction any contrivance for either defeating or delaying creditors, and invalidates such contrivances without regard to the motives of the parties." [Bump on Fraud. Convey., secs. 26, 27.]

In the circumstances already related, it will be presumed that the bank was not ignorant of the fact that Johns, after executing the to-be-dormant mortgage to it, went on buying goods from parties in Chicago and elsewhere, goods which he could not have purchased on a credit, had the mortgage been recorded and his true financial condition had thus been made known. But whether cognizant or not, the result is not affected thereby.

But another objection exists to the mortgage to the bank when considered in connection with the concomitant circumstances which have been heretofore touched upon. I allude to the established facts that Johns after executing that mortgage which absolutely forbade his selling any of the goods, covered by that instrument, and made it a breach of condition for him to do so, still continued as before to sell goods over his counter just as before, and applied the proceeds to his own use. Now it is well settled in this State that if a chattel mortgage contains such a provision as above it is void on its face, and that if it be shown by evidence *aliunde* that there is an agreement to that effect, such an agreement is equally as effective in rendering the mortgage void. [Bank v. Powers, 134 Mo. 432; Bullene v. Barrett, 87 Mo. 185; Barton v. Sitlington, 128 Mo. 164, and cases cited.] It has been determined by this court: That notwithstanding such obnoxious provision either on the face of the mortgage or extraneously established, if the mortgagee take possession under his mortgage, prior to the levy of a writ of attachment, such possession will purge the transaction between

mortgagor and mortgagee of any objectionable feature. [Barton v. Sitlington, 128 Mo. 164, and cases cited.]

But, as has been expressly decided, such taking possession will not nullify or neutralize an actual fraud such as that perpetrated between the bank and Johns in concealing by agreement the mortgage between them, thus imposing and practicing upon the creditors of Johns a deception which enabled Johns to purchase the goods whose seizure under attachment gave origin to the present litigation.     Existing such fraud, even as to a portion of the indebtedness, it will taint the whole transaction.     [State ex rel. v. Hope, 102 Mo. 410; Boland v. Ross, 120 Mo. 208; Barton v. Sitlington, *supra*, and cases cited.]

That Mrs. Mayer's agent, Young, regarded the mortgage of the bank as worthless, is shown by what Young said to Johns about it, to wit:     That it was "no good on earth." But notwithstanding such admission, Young proceeded to draft a mortgage for his principal, which mortgage recognized the existence of the "no-good-on-earth" mortgage of the bank; caused the mortgagee of his principal to be subject to that mortgage, and in the end joined in with the bank and Deemer in taking a joint and common possession of the whole of the stock of goods, whether bound by any one of the mortgages or not, and posted a notice accordingly, and not satisfied with that, Young, as the agent of his principal, entered into a subsequent written agreement with the bank whereby the two were to make "common cause against the other creditors," and makes provision that if both were successful in the controversy, the property or its preceeds should be divided equally between the bank and Mrs. Mayer (regardless of the amount of Johns' indebtedness to them respectively) and that if only one of the two contestants should prove successful, that one (regardless of the debt owing) should have the entire property or its proceeds.

It will be noted that this instrument did not regard Deemer as having any rights which a white man was bound to respect.    This agreement, though subsequent in point of time to the drafting of the mortgage and the taking possession of the goods as per notice, gives a clear insight of the *animus* which prompted the action of the bank and Mrs. Mayer in the whole transaction, which was to "hinder or delay or defraud" the creditors of Johns.    Subsequent acts of the parties are admissible in evidence when calculated to explain the motives which actuated them in the beginning and thus give tone to the original fraudulent purpose.    [Wait, Fraud. Convey. (3 Ed.), sec. 228.]

But the debt to the bank being fraudulent, as already stated, it is sufficient to defeat the action of plaintiff that Young undertook the task of bolstering up the claim of the bank in the manner as above related, to the intended or the resultant prejudice of Johns' creditors.

And this wrongful conduct of Young as aforesaid, became that of his principal; he acting as her agent in the matter.    "His object became hers; his frauds were her frauds; and she is responsible therefor, however destitute of any knowledge.thereof."    [Warner v. Warren, 46 N. Y. loc. cit. 233; Wharton on Agency, sec. 164; Mechem on Agency, sec. 739; Wait, Fraud. Convey. (3 Ed.), sec. 198.]

Taking into consideration all of the foregoing matters, no doubt is felt as to the correctness of the action of the trial court in giving the peremptory instruction in question.    [McDonald & Co. v. Hoover, 142 Mo. 484; Bauer Grocery Co. v. Smith, 61 Mo. App. 665; Seger's Sons v. Thomas Bros., 107 Mo. 635.]

And it is a well established rule in this court that where it appears from the evidence that if a verdict were given for a certain party it would be the duty of the trial court to set such verdict aside, as supported by the evidence, then it becomes the plain duty of such court to direct a verdict for the

opposite party. [Morgan v. Durfee; 69 Mo. 469; Powell v. Railroad, 76 Mo. 80; Lenix v. Railroad, 76 Mo. 86; Landis v. Hamilton, 77 Mo. 554; Jackson v. Hardin, 83 Mo. 175; Reichenbach v. Ellerbe, 115 Mo. 588.]

Holding these views, judgment affirmed. All concur.