## McELVAIN v. HARDESTY.

### (Circuit Court of Appeals, Eighth Circuit.  March 24, 1909.)

#### No. 2,783.

1. BANKRUPTCY (§ 184*)—TRANSFERS VOID UNDER STATE LAWS.

A contract for the sale of a saloon provided that the receipts of all sales should be deposited in a certain bank to the credit of the saloon, and used for no other purpose than the payment of the saloon indebtedness, necessary running expenses, and the balance of the purchase price, and in case of a failure on the part of the buyers to well and truly comply with the conditions of the agreement, the contract should be void and the saloon should become the property of the seller, with all moneys belonging thereto.  *Held* that, whether such agreement was a conditional sale or chattel mortgage, it was one or the other, and was void until filed in the recorder's office of the county in which the mortgagors or vendors resided, as required by Rev. St. Mo. 1899, §§ 3404, 3410, 3412 (Ann. St. 1906, pp. 1936, 1940, 1945), especially as against subsequent creditors of the purchasers, whose claims were represented by the purchaser's trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 276; Dec. Dig. § 184.*]

2. BANKRUPTCY (§ 160*)—PREFERENCES—INSOLVENCY.

Bankruptcy Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), provides that if the bankrupts at the time of the transfer in question were insolvent, and the effect of the transfer was to enable the transferee to obtain a greater percentage of his debt than any other creditors of the same class, such transfer constituted a preference.  *Held*, that under the provision of the same section that the four months' time within which transfers by the bankrupt are presumed to be invalid shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required, the effect of a transfer by the bankrupts as constituting a preference must be judged as of the date it was filed for record, and if the bankrupts were then insolvent, and the transfer would enable the transferee to obtain a greater percentage of his debt than other simple contract creditors, it constitutes a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 249–258; Dec. Dig. § 160.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied May 26, 1909.

**3. BANKRUPTCY (§ 160\*)—PREFERENCES—INSOLVENCY.**

A contract for the sale of a saloon required subsequent receipts to be used for the payment of running expenses, the indebtedness of the seller, and the balance of the purchase price, and declared that on default the contract should be void and the saloon become the property of the seller, with all moneys belonging thereto. When the buyers purchased, their capital amounted to only $500. They agreed to pay $3,900 for the saloon, including the seller's outstanding obligations, amounting to $2,600. In seven months they had lost their capital and had paid the seller's indebtedness, but in its place had incurred a like amount of unpaid indebtedness to their current merchandise creditors, when default was made in payment of one of the purchase-money notes, whereupon the seller recorded his contract on July 7, 1905, and took possession, after which the buyers became bankrupts. *Held*, that the buyers were insolvent when the transfer was recorded, and that such transfer constituted a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 249–258; Dec. Dig. § 160.\*]

**4. BANKRUPTCY (§ 303\*)—PREFERENCES—KNOWLEDGE OF INSOLVENCY.**

Evidence *held* to show that the seller of a saloon business to the bankrupts, taking a lien thereon for an unpaid portion of the price, had knowledge of the bankrupt's insolvency at the time he filed his lien contract for record, and had reasonable cause to believe that the preference which was actually given him by the bankrupts in surrendering possession under such contract was intended by the bankrupts to constitute a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 462; Dec. Dig. § 303.\*]

**5. BANKRUPTCY (§ 305\*)—PREFERENCE—RESTORATION OF PROPERTY IN KIND.**

Where property transferred by a bankrupt to a lien creditor pursuant to a voidable preference could not be restored in kind to the trustee, the latter could recover its value.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 466–468; Dec. Dig. § 305.\*]

**6. BANKRUPTCY (§ 205\*)—PREFERENCES—CREDITORS—LIABILITY.**

Where a seller of a saloon business to the bankrupts, at the time of retaking possession under a lien contract, constituting a voidable preference, accounted to the bankrupts for the difference between his debt and the fair value of the property, such seller was not accountable to the bankrupt's trustee for the difference so paid, whether it was returned by the bankrupts or paid over to another creditor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 234; Dec. Dig. § 205.\*]

**7. BANKRUPTCY (§ 303\*)—VOIDABLE PREFERENCE—GOOD WILL.**

In a suit by a bankrupt's trustee to recover the value of the property of a saloon business retaken by a lien creditor pursuant to a contract of sale, constituting a voidable preference, evidence *held* insufficient to show that the business, at the time defendant resumed possession thereof, had any appreciable good will, and hence the court erred in charging defendant for the value thereof.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 462; Dec. Dig. § 303.\*]

**8. BANKRUPTCY (§ 293\*)—PREFERENCES—ACTION BY TRUSTEE—JURISDICTION.**

Bankruptcy Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), confers plenary jurisdiction on courts of bankruptcy, as well as other courts therein mentioned, of an action by a bankrupt's trustee to recover the value of property taken by a lien creditor pursuant to a voidable preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 410–412; Dec. Dig. § 293.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southeastern Division of the Eastern District of Missouri.

A. L. Oliver (R. B. Oliver, R. B. Oliver, Jr., and Charles B. Faris, on the brief), for appellant.

Benson C. Hardesty (Sterling H. McCarty, on the brief), for appellee.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

ADAMS, Circuit Judge. The trustee of the partnership estate of Crawford & Carter in bankruptcy brought this action in equity to annul the transfer by the firm of its stock of liquors and other saloon property to the defendant, McElvain, and to recover their value on the ground, among other things, that the transfer constituted a voidable preference within the meaning of Bankr. Act July 1, 1898, c. 541, §§ 60a, 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1907, p. 1031). The learned trial court sustained the contention of the trustee and rendered a judgment against the defendant for the value of the property transferred including $600 for the supposed value of the good will of the business. Hence this appeal.

Many of the material facts are uncontroverted. All the parties to the original transaction were saloon men familiar with the business as carried on in Caruthersville, Mo., the scene of the present controversy. In December, 1904, McElvain owned the saloon and sold it, with an unexpired license to carry on the business, to Crawford & Carter for $3,900. They had little money but apparently much confidence. They paid $500 in cash, which constituted all their means, executed and delivered to McElvain their eight promissory notes each for $100 payable monthly, and assumed and agreed to pay McElvain's maturing obligations for supplies which he had purchased while owning and operating the saloon, amounting to about $2,600. McElvain continued to carry on the saloon business in two other places in the same town. Simultaneously the following agreement was executed and delivered:

"This agreement made and entered into this 9th day of December, 1904, by and between J. M. McElvain, party of the first part, and H. C. Carter and. G. C. Crawford, of Caruthersville, Missouri, parties of the second part, witnesseth: That whereas, the said party of the first part has this day sold and delivered to the said parties of the second part the Climax saloon, in the city of Caruthersville, Missouri, upon the following terms and conditions: Conditioned, that the said parties of the second part assume all indebtedness of the said Climax saloon, and fully pay off and discharge same as fast as said indebtedness matures, and that the said party of the first part own and collect all debts due said Climax saloon up to this date, and that all sales of said Climax saloon be deposited in the Bank of Caruthersville, in the city of Caruthersville, Missouri, to the account of the Climax saloon, and no part of said sales to be used, by the said parties of the second part for any other purpose, other than the payment of the indebtedness of said saloon and the necessary running expenses of the same, together with eight promissory notes given the said party of the first part, for one hundred dollars each, one due every thirty days from date, being the purchase money of said saloon, and in case of a failure on the part of the said parties of the second part to well and truly comply with the conditions of the agreement, fully pay off and discharge all of said indebtedness as the same matures, then the contract to

169 F.—3

be void, and the said saloon herein sold to become the property of the said party of the first part together with any and all moneys belonging to said saloon, either in the Bank of Caruthersville or elsewhere. Witness whereof that the said parties have hereunto set their hands the day and year aforesaid.

"[Signed]                                                    J. M. McElvain,
                                                              "G. C. Crawford,
                                                              "H. C. Carter."

The firm took possession and operated the saloon for about seven months until July 13, 1905. During that period they paid between $2,400 and $2,500 of the vendor's debts and also two or three of the purchase-money notes. The balance of those maturing were dishonored. In the seven months they had so reduced their total indebtedness to the vendor of $3,400 that only $730 remained unpaid.

The agreement of December 9th, although signed by the parties, was never acknowledged and was not filed for record or recorded in the recorder's office of Pemiscot county, wherein Caruthersville was situated and the vendors resided, until July 7, 1905. McElvain then upon hearing of the dishonor of one of the firm's checks out of solicitude for the balance of $730 due him on the purchase price caused it to be filed for record. Immediately upon taking this step he demanded payment of his notes then overdue and upon refusal asserted his right alleged to exist under the agreement of December 9th to the possession and ownership of the saloon and contents, and this right seems to have been accorded to him by the firm. An inventory and valuation were then taken, showing stock on hand of the value of $1,072. McElvain took this property which constituted all the assets of the firm as well as of its individual members at that figure, and gave to the firm his promissory note for $342, the excess over his own debt then due. This note was immediately transferred to J. S. Wahl in part payment of a debt due by the firm to William J. Lemp for which Wahl was surety. During these seven months while the firm was paying over $2,600 of McElvain's merchandise debts and some of the purchase-money notes, it purchased new goods to replennish its stock from wholesale houses to the amount of over $3,600, and at the time of cessation of business had paid on account thereof about $1,000, leaving a balance of over $2,600 still unpaid. This sum of money represents the debts now due to the creditors of the estate of the bankrupts, and these debts were all contracted while McElvain withheld his agreement from the record and on the faith of the firm's being the real as they were the ostensible owners of the saloon. The saloon and property therein which the firm transferred and delivered to McElvain constituted all their assets, so that unless a recovery be had in this action the merchandise creditors of the firm with claims amounting to $2,600 will have no participation in the firm's assets. On October 30, 1905, the firm and its individual members were adjudicated bankrupts on a petition filed by their creditors against them on October 2, 1905. The filing of the agreement for record and the transfer to McElvain were therefore within four months before the filing of the petition in bankruptcy.

Whether this agreement measured by the rules laid down by us in Re Columbus Buggy Co., 143 Fed. 859, 74 C. C. A. 611, and Dunlap v. Mercer, 156 Fed. 545, 86 C. C. A. 435, be a chattel mortgage or a

conditional sale, about which much argument was indulged, we deem it unnecessary to decide. It was clearly one or the other, and in either case the law of Missouri made it invalid and void against creditors of the mortgagors or vendors, until recorded or filed in the recorder's office of the county in which the mortgagors or vendors resided. Sections 3404, 3410, 3412, Rev. St. Mo. 1899 (Am. St. 1906, pp. 1936, 1940, 1945). This is particularly true as against subsequent creditors like those represented by the trustee in this case who incurred their debts on the faith of an apparent unencumbered and unconditional ownership by their debtors of their property. Collins v. Wilhoit, 108 Mo. 451, 18 S. W. 839; State, to Use of Mayer, v. O'Neill, 151 Mo. 67, 52 S. W. 240; Oyler v. Renfro, 86 Mo. App. 321; Landis v. McDonald, 88 Mo. App. 335; Harrison & Calhoun v. South Carthage Min. Co., 95 Mo. App. 80, 68 S. W. 963, s. c. 106 Mo. App. 32, 79 S. W. 1160; Gilbert Book Co. v. Sheridan, 114 Mo. App. 332, 89 S. W. 555; First Nat. Bank of Buchanan County v. Connett, 142 Fed. 33, 73 C. C. A. 219, 5 L. R. A. (N. S.) 148.

From the foregoing it appears that the law of the state of Missouri required a recording or registering of the agreement of December 9th in order to validate it as against the creditors of Crawford & Carter.

Section 60a of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]) provides that if Crawford & Carter were, at the time of the transfer in question, insolvent, and if the effect of the transfer was to enable the transferee to obtain a greater percentage of his debt than any other creditors of the same class, such transfer constituted a preference. The same section provides that the four months' time there referred to shall not expire until four months after the date of the recording or registering of the transfer if by law such recording or registering is required.

In view of the foregoing the effect of the transfer to McElvain is to be judged as if made on the 7th day of July, 1905, when it was filed for record. If Crawford & Carter were then insolvent, and if the effect of the enforcement of the transfer was to enable McElvain to obtain a greater percentage of his debt than any other of their simple contract creditors, the transfer constituted a preference within the meaning of the bankruptcy law.

There can be no doubt of the firm's insolvency at that time. It embarked in business seven months before with a capital of $500 only. They had then lost their capital and had paid $2,600 indebtedness to McElvain, but had incurred a like amount of unpaid indebtedness to their current merchandise creditors. As a result they had lost all their capital and had merely substituted several creditors for one. They were hopelessly insolvent on July 7, 1905, and without any doubt the effect of the transfer, if held good, would enable McElvain to obtain a greater percentage of his debt than other like creditors would get. He would get practically all of his debt, and they practically nothing.

Notwithstanding the fact that the transfer constituted a preference, it was not voidable by the trustee, and he could not recover the prop-

erty transferred or its value unless the transferee had reasonable cause to believe a preference was thereby intended to be given to him. Section 60b of the Bankruptcy Act. As, for the purposes of this case, the transfer is to be treated as made on the date the agreement was recorded, so the transferee's belief or cause for belief concerning it must relate to that time. The evidence of two witnesses including Carter, one of the firm, strongly tends to show that McElvain had full knowledge of the hopelessly insolvent financial condition of the firm when he recorded the agreement and took possession of the saloon. Other witnesses, including McElvain, testify to the contrary. A careful consideration of all the evidence satisfies us that the testimony of the two witnesses referred to was correct. It comports with the probable and harmonizes with all the facts and circumstances of the case. McElvain lived in the same town as his creditors and carried on the saloon business on his own account in two other places. It was a small town of only about 2,000 inhabitants, where familiarity with the business and financial condition of competitors in trade is not uncommon. He was deeply interested in the firm's business. His personal interest in seeing that his old debts and his purchase money should be paid made it a reasonable thing for him to inquire about and become familiar with the affairs, purposes, and intentions of his debtors.

Moreover, if McElvain did not have actual knowledge of the insolvent condition of his debtors, we think in the circumstances of this case he is constructively chargeable with that knowledge. He took a transfer of all his debtors' property—of a going concern—in satisfaction of a debt. This in itself was an unusual thing, and the reasons which actuated it must have sprung from a fear or suspicion of danger. Solvent and prosperous business houses do not commonly pay debts that way. He knew of his own dishonored notes. He knew that his debtors could not have carried on active business for seven months and thereby make enough to pay over $2,600 upon his own indebtedness assumed by them without purchasing supplies. These facts and many others disclosed by the record were sufficient to put him as an ordinarily prudent man upon inquiry as to his debtor's solvency and to charge him with all the knowledge he could have acquired by the exercise of reasonable diligence. In re Eggert, 102 Fed. 735, 43 C. C. A. 1; Pittsburgh Plate Glass Co. v. Edwards, 148 Fed. 377, 78 C. C. A. 191; Houck v. Christy, 152 Fed. 612, 81 C. C. A. 602, 605, and cases cited. If he had resorted to the most obvious sources of information and had made inquiries of his debtors, or if he had exercised the right commonly exercised by creditors of examining the account books of their creditors, he would have quickly ascertained what Carter testifies to be true, that: "The size of his pile was $1.80"; that "Crawford had a horse and buggy and possibly a colt"; and that these were the only assets available for them to pay an indebtedness of $2,600 due to their general creditors.

On the testimony disclosed by this record we have no doubt that McElvain had reasonable cause to believe that the preference which was actually given him was intended by his debtors for that purpose.

Inasmuch as the property transferred cannot be restored in kind to the trustee, the latter under the statute is entitled to recover its value. It seems to be agreed that the valuation of $1,072 put upon the property when the inventory was taken is substantially correct. This being in excess of McElvain's debt in the sum of $342, he at the time and as a part of the transaction accounted to the firm for that excess and cannot be held accountable to the trustee for it. The defendant did not accept the transfer to that extent, and the learned trial court improperly included it in the sum awarded to the trustee. Whether the firm retained it or paid it over to another creditor is immaterial. The trial court also allowed a recovery of the sum of $600 for the good will of the business of Crawford & Carter claimed to have been transferred to McElvain. Without expressing any opinion as to when and under what circumstances, if at all, the good will of a business may be "property" within the meaning of section 60a and 60b of the Bankruptcy Act, we content ourselves by stating the conclusion reached that, if the saloon ever had any good will of value known to the law, it had been utterly destroyed by the methods pursued and the results achieved by the bankrupts and McElvain during the seven months of their relationship to it. The evidence satisfies us that there was no good will of value at the time of the transfer, and that the allowance of anything in favor of the trustee on that account was erroneous.

Defendant's contention that the court of bankruptcy had no jurisdiction to grant the relief sought in this action is untenable. Section 60b of the Bankruptcy Act, which gave the right, conferred plenary jurisdiction upon the court of bankruptcy as well as upon other courts there mentioned to enforce it. Other questions which were argued by counsel for appellant have been carefully considered and are found to be without merit.

The decree must be reversed, and the cause remanded to the trial court with directions to enter a decree for $730, instead of $1,672, and in all other respects to conform to the terms of the decree appealed from.

It is so ordered.