ROBERT E. WHALEN and Others, Respondents, *v.* HUDSON HOTEL COMPANY and Others, Appellants.

Third Department, May 8, 1918.

Corporations — action to cancel stock subscriptions — counterclaim for debts alleged to exist against corporation — evidence — validity of subscription dependent upon payment of ten per cent — payment of capital specified in certificate of corporation as condition precedent of commencing business or creating an indebtedness — agreement to give common stock for properties known to be worth less than par value — liability of stockholders for amount unpaid thereon — liability of stockholders to assessment.

Where in an action by stockholders to procure the cancellation of their subscriptions to preferred stock, it appears that the corporation, as contradistinguished from the acts of the promoters as such, was a mere paper corporation and did no real business aside from certain acts of the promoters in seeking to float the scheme; that it is for all practical purposes at an end; that the subscriptions were obtained by false and fraudulent representations; that alleged corporate claims were against the promoters

only, and at the time of their creation the company had no right to incur any liability, the subscriptions should be canceled and a counterclaim of the receiver for the alleged debts existing against the company should be dismissed.

The payment of ten per cent of a subscription after organization is a condition precedent to its validity.

A corporation prior to receipt of the amount required as a condition of its creating an indebtedness has no right to purchase real estate, to employ architects, solicitors for stock subscriptions, or to borrow money to pay on an option.

The doctrine that a corporation which has agreed·to give common stock for property known to be worth much less than the par value of the stock cannot recover against the stockholders for the amount unpaid on the stock, for the reason that the agreement was made by all the parties interested and binding upon them, does not interfere with the generally recognized right of creditors to inquire into the value of the property received for stock and to recover from a stockholder the difference between the value of the property and the par value of the stock.

*Prima facie* subscribers to the stock of a corporation are not liable to assessment, and the company cannot begin business until the total capital has been subscribed.

Under section 3 of the Business Corporations Law, prohibiting a corporation from incurring any debt until the capital specified in its certificate as the amount with which it will begin business " shall have been paid in, in money or property," if the money or property specified is actually paid in, the company may transact business and the subscriptions may be binding, although the entire stock is not subscribed, but a fictitious subscription cannot be counted as completing the subscription for all the stock, nor can a fictitious payment have any effect under the statute.

APPEAL by the defendants, Hudson Hotel Company and others, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Schenectady on the 19th day of September, 1917, upon the decision of the court after a trial at the Schenectady Special Term.

*Grout & McKinney* [*Edward M. Grout, Paul Grout* and *Charles B. La Voe* of counsel], for the appellants.

*John A. Stephens* [*D-Cady Herrick* of counsel], for the respondents.

JOHN M. KELLOGG, P. J.:

The judgment appealed from, in substance, cancels the plaintiffs' subscriptions to the preferred stock of the Hudson

Hotel Company, and disallows the counterclaim of the receiver of the company alleging that certain debts exist against the company and asking an accounting with reference to the payment thereof. The Hudson Hotel Company, as contra-distinguished from the acts of the promoters as such, was a mere paper corporation, and did no real business aside from certain acts of the promoters in seeking to float the promotion. Concededly the promotion scheme, and the company, for all practical purposes, are at an end, and unless there are creditors having valid claims against the company, there is no reason why the subscriptions should not be canceled. There is no *bona fide* creditor of the company. The scheme having collapsed through no fault of the plaintiffs, the promoters are seeking to recoup their losses. To prevent confusion we may assume, or at least not deny, that if there were just debts against the company in behalf of *bona fide* creditors, the receiver could enforce the unpaid subscriptions by his counterclaim to the extent of such liability. But where the alleged indebtedness is all in favor of the promoters for expenses and services, which as between them and the plaintiffs should be borne by the former, a different situation arises, as the case then depends upon the relations and equities existing between them. What is said here relates solely to the relations existing between the parties to this case and not to the general liability of subscribers to a receiver of a company for the amounts unpaid on the stock subscriptions.

Sometime prior to July, 1911, Kiernan, an insurance man at Albany, became satisfied that the old Globe Hotel property there was valuable as a site for a new hotel. He bought the property on speculation, taking title July 12, 1911, and immediately employed a broker in New York to sell it. The broker interested Rhodes, with the result that Andrews became interested and had an interview with Kiernan. Andrews, in behalf of his associates, sent an expert to examine and report upon the situation, who reported favorably upon the site and undertaking, but thought the price, $500,000, was high, in the estimation of Albany people. He estimated that $500,000 of the stock of the company could be sold there. Andrews caused it to be understood by Kiernan that he had gone over the matter with his associates, Taft, duPont,

Boomer, Merry and others, who were men of great wealth, and interested with him in other hotel enterprises, and that they would build the hotel, taking the necessary stock and bonds after they had sold what stock they could in Albany and elsewhere. An agreement in writing was made December 8, 1911, by which Kiernan sold the property to Andrews and Boomer, who were acting in behalf of themselves and their associates, for $500,000, of which $5,000 was to be paid in cash, $20,000 within fifteen days thereafter and $50,000 on or before April 15, 1912, at which time the deed was to be given, subject to a mortgage of $200,000, the purchasers to give their note for the balance, $225,000, secured by a second mortgage on the property. The contract provided that if the purchasers fail to make any of the payments the moneys paid should belong to Kiernan and the agreement shall thereupon " cease and determine without any further liability whatsoever on the part of " the purchasers. This agreement was, in effect, a mere option to purchase, the promoters paying $25,000 for the option to April 1, 1912, which payment should apply upon the purchase price if the option was exercised.

Andrews, with the assistance of Boomer and Merry, promptly paid the $5,000 and the $20,000 within the fifteen days. Kiernan, as an inducement to the agreement, agreed that he would give the promoters his assistance at Albany in obtaining subscribers for stock, and, as an independent agreement, was to take $25,000 of the stock, and perhaps more.

January 12, 1912, Kiernan, Andrews, Boomer, Rhodes and Ulman caused to be filed a certificate of incorporation of the Hudson Hotel Company, executed by them, and in which they each subscribed for two shares of stock, and they and Taft, duPont, Stoddard and Rhodes were named as directors for the first year. The certificate provided for $1,250,000 of preferred stock and $1,750,000 of common stock; it provided also that $1,000 was the amount of capital with which the corporation should begin business. It also had a provision that it was within the contemplation of the incorporators that the directors will have occasion to take action with respect to matters in which they or some of them may be interested, either individually or as trustees for or representatives of other persons, and continued: " In the absence of

actual fraud, no contract made or other action taken by the concurrent votes of a majority of the entire number of directors shall be invalid or voidable by reason of the fact that some or all of the directors are interested, nor shall any director be incapacitated from voting upon any such contract or with respect to any such action by reason of such interest."

At a so-called meeting of the incorporators and subscribers, February 29, 1912, at which Andrews, Boomer, Rhodes and Ulman were the only persons present, Ulman having a proxy for Kiernan, a resolution was passed, Andrews and Boomer not voting, that in the opinion of the directors the rights secured by Boomer and Andrews under the agreement with Kiernan were worth $1,750,000, and that it was for the interest of the company to purchase such rights for that sum, to be paid by the issuing of the common stock of the company to them and that the company accept the assignment and issue therefor $1,750,000 of full-paid common stock and proceed to carry out such agreement. It is clear that this resolution was a mere scheme to appropriate the common stock for the benefit of the promoters, without consideration. They knew the agreement with Kiernan, and that $500,000 was a large price to be paid for the site. All were acting in bad faith for their own interests and against the interests of the company. Boomer and Andrews did not vote; but they had the same right to vote that any of the other persons present had, for apparently they all were interested in the promotion and the contract with Kiernan.

The clause we have quoted does not help out the transaction. It relates only to directors and to actions taken in good faith. This was a stockholders' meeting, although there is some confusion in the minutes. If it was a directors' meeting there is nothing to show that Taft, duPont or Stoddard had any notice of it. We need not discuss the effect of this clause in the articles of incorporation. It can have no such force as is claimed for it here, and if it could affect such transactions as we are discussing, it would clearly be against public policy and without force.

If there was otherwise any doubt as to what those present at the meeting thought the site was worth, or as to what it was costing the hotel company, it is made clear by a

reference to the prospectus which was exhibited by Rhodes to some of the Albany stockholders when he was seeking their subscription. It gave the investments and resources of the company, valuing the land at $500,000. No person had any idea that it was of greater value than the amount unpaid on the Kiernan contract or that the company was paying more than that sum for it.

At the time of the incorporation of the company, Andrews & Co. paid $1,750, the expense of organization and charged it against the hotel company in an account embracing various other items. Andrews, in a way, wants to be understood as saying that this was a payment for the directors' shares and that thereby the hotel company became possessed of the $1,000 which the law required it to have as a condition of entering on active business. But the facts are against that claim. None of the stockholders requested Andrews or his company to make any payment for them, and apparently none of them knew at the time, or had any information that Andrews & Co. were paying any money on his account. The articles of incorporation vested the voting power and the control of the company solely in the common stock, from which we infer that the shares subscribed for by the organizers were the common stock. The fact that the company, promptly upon its organization, voted the entire $1,750,000 of common stock to Boomer and Andrews in lieu of that amount of money, as it is alleged, shows clearly that the organizers or directors had not paid for any stock.

Andrews & Co. was closely associated with the promotion. That company was in the architectural business, specializing in hotel construction. Andrews was its president and a director and Ulman a director and counsel. Taft was also a director. It is evident that Andrews & Co. advanced the organization expenses as a loan, to be repaid by the hotel company from the proceeds of stock and bonds sold. The advance only resulted in an attempt to create a debt against the hotel company for the amount advanced. It is a pure fiction to treat it as a payment for the directors' shares, as that was not within the intent of the parties.

No other subscriptions to stock were made except by the

plaintiffs, the Albany subscribers, and none of them paid anything on account of their subscriptions until January 4, 1913. There were, therefore, no legal subscriptions for the preferred stock until that date, as the payment of ten per cent of a subscription after organization is a condition precedent to its validity. (*Hapgoods* v. *Lusch, No. 1,* 123 App. Div. 23; *Union Hotel Co.* v. *Hersee,* 79 N. Y. 454.) The company, therefore, prior to January 1, 1913, had not received the $1,000 required as a condition of its creating an indebtedness. It, therefore, had no right to purchase the real estate, to employ architects, solicitors for stock subscriptions, or to borrow money to pay upon the option.

It is said that *Blum* v. *Whitney* (185 N. Y. 232) and *Old Dominion Copper Co.* v. *Lewisohn* (210 U. S. 206) prevent an inquiry in behalf of a corporation as to the consideration for which the common stock was voted away. Those cases hold that a corporation which has agreed to give common stock for property known to be worth much less than the par value of the stock, cannot recover against the stockholders for the amount unpaid on the stock, for the reason that the agreement was made by all the parties interested, and binding upon them. The doctrine of those cases does not interfere with the generally recognized right of creditors to inquire into the value of the property received for stock and to recover from a stockholder the difference between the value of the property and the par value of his stock. Here the alleged creditors are the promoters. The plaintiffs have paid ten per centum upon account of their subscription and the promoters nothing for their stock. If the promoters had valid claims against the company, the receiver, as a matter of justice, should not be permitted to recover against the plaintiffs for the benefit of such creditors until they have paid the same percentage. Justice is done by leaving them where they have placed themselves.

*Prima facie,* subscribers to the stock of a corporation are not liable to assessment, and the company cannot begin business until the total capital has been subscribed. (*Bray* v. *Farwell,* 81 N. Y. 600; *Myers* v. *Sturgis,* 123 App. Div. 470, 472; affd., 197 N. Y. 526.)

Section 3 of the Business Corporations Law prohibits a

corporation from incurring any debt until the capital specified in its certificate of incorporation as the amount with which it will begin business " shall have been paid in in money or property." It results from this provision that if the money or property specified is actually paid in, the company may transact business, and the subscriptions may be binding although the entire stock is not subscribed. It is evident that a fictitious subscription cannot be counted as completing the subscription for all the stock; neither can a fictitious payment have any effect under this statutory provision. The rights of stockholders to question the company's acts, or the rights of the company to question its own acts, or the rights of stockholders between themselves, are not involved, for until the $1,000 is actually paid in, in money or property, the company is a mere paper corporation without the capacity to incur any debt.

When the plaintiffs were asked by the promoters to subscribe for the stock of the company, the real situation was that some promoters in New York, with the expectation of realizing large profits, were promoting this hotel scheme at Albany, and had caused it to be understood there that they were men of great wealth, were to build the hotel, but desired citizens of Albany to be interested as stockholders to give a local color and aid them in obtaining the subscriptions and contribute to the success of the hotel when built, and that the promoters would subscribe and pay for the stock and bonds not otherwise taken. The plaintiffs were not in any sense the promoters of the company, but as a matter of local pride and interest they wanted to see a new hotel at Albany and felt that the investment would be reasonably safe. Unbeknown to them the promoters so far as they were able had given away all of the common stock of the company together with the exclusive control and management of its affairs and business to themselves; the company had never received any money or money's worth from the stockholders or otherwise, and was not authorized to incur indebtedness; the alleged contract for the site was made by the company at a time when it had no authority to make such a contract. The subscription paper presented to the plaintiffs recited that the company had acquired the site and proposed to build a

twelve-story hotel upon it, and had an authorized capital of $1,250,000 of preferred stock and $1,750,000 of common stock, "a part or all of which is to be disposed of for the purposes aforesaid." So far as the paper indicated that the common stock was to be used in completing and equipping the hotel, it was false upon its face, and the statement that it had acquired the site was not consistent with the facts. The subscription paper was drawn by one of the associate promoters — their counsel, the present receiver — with the evident purpose of keeping from the proposed subscribers the real facts and of holding out to them conditions which did not exist. If the facts as they actually existed had been known, it is improbable that the plaintiffs would have subscribed. The plaintiffs signed for stock amounting to $207,000, of which $79,500 was signed after the dinner at the Albany Club, April twelfth, and before May third and $50,000 from May third to June twelfth. But upon April fifteenth default was made in the Kiernan option, and if he had insisted upon it the option was at an end. Clearly the company had not acquired a site.

Evidently Kiernan became impatient, and in June, 1912, $12,250 was paid on account of the option, which probably in a way gave it life. Again he received about December fifth, $19,500, which probably gave it additional life. No other payments were made upon the contract and he formally terminated it on March 1, 1913. These payments were financed through director duPont, and were authorized at a directors' meeting at which he was present and voted. They were not made in the interest of the company, but in the interest of himself and his associates in order to keep the scheme alive. Some cause for delay had arisen and for some reason the promoters were not then prepared to definitely enter upon financing the scheme, nor were they willing to abandon it. But hope was not abandoned and for that reason in the interest of the promotion, these payments were made and are the basis of the claim which duPont makes here through the receiver. As between duPont and the plaintiffs it is evident that justice requires that the loss should remain where his acts have put it. DuPont and the plaintiffs are the only ones since the incorporation who have paid any

real money on account of the scheme, except that Andrews & Co. advanced certain moneys to Rhodes who had been employed by Andrews and Boomer in the interest of the promoters to sell the stock of the company under an agreement made before the incorporation of the company that he should have five per cent upon the sales with a drawing account upon Andrews & Co. for his expenses, which were to be taken from his commissions. From the fact that Rhodes was giving common stock, the property of the promoters, as a bonus to induce certain subscriptions when necessary, and from the time and nature of the employment and all of the circumstances it is evident that his services were being performed for the promoters and not for the company. It is a strange contention that the plaintiffs should be compelled to pay a commission to Rhodes for obtaining their subscriptions.

The directors of the company, December 31, 1912, first requested the plaintiffs to pay the ten per cent on their subscription to which a general response was made. The plaintiffs had done everything they undertook to do, but the promoters have failed in putting up any money and in carrying out the understanding upon which the plaintiffs' subscriptions were obtained. The cause of the failure is quite unimportant. It was probably apparent to the promoters before the money was raised through director duPont, with which to make the payment in June to Kiernan, that the $500,000 would not be subscribed in Albany, and that the project must, with a small assistance from Albany, be financed through them. For some reason there was delay. Notwithstanding all the facts, Andrews & Co. proceeded to make detailed plans and specifications for the hotel which they completed in September, 1912. In December the Thompson-Starrett Company put in a bid for its construction at $1,970,000, which bid was produced at the trial. Andrews claims that separate estimates were made by others which very much reduced the amount, but he testifies that from September until March he, on account of sickness, had no practical use of his mind and evidently he had no knowledge of those matters and the details are not before us. We may, therefore, assume that the hotel, the cost of which in the prospectus was estimated at $1,100,000, could not be built for less than $1,970,000.

Perhaps that fact, or the sickness of Andrews, or the receivership over Andrews & Co. (the time of which does not appear) may have prevented the promoters from carrying out the scheme. It is not probable that the promoters expected that the entire common stock was to be a clear profit to them. They gave away some of it as a bonus to subscribers to the preferred stock. The $25,000 paid Kiernan would naturally be met from this source, and the commissions of Rhodes and other items too numerous to mention.

It is difficult to understand why the company wanted detailed plans and specifications of the building made at an expense of many thousands of dollars, without knowing whether the project was to go on. The stock was being sold upon a sketch and on a general description, and plans would be necessary, so far as the company was concerned, only when the construction of the hotel was to be entered upon. We have seen that the Kiernan option was in default and that the subscriptions were coming in slowly. There can be but one good reason why detailed plans and specifications were necessary at the time they were prepared. Before putting up their own money the promoters wanted to know just what the hotel would cost and that could not be ascertained without the detailed plans and specifications, and the ascertained cost was clearly beyond their expectations. Undoubtedly if the hotel was to be built they expected that the plans would be used by the company and they would be reimbursed for them, but the making of the plans at the time and in the manner shown was clearly in the interest of the promoters and not for any possible use of the company.

The time did not arrive when the company was authorized to contract any indebtedness until after January 4, 1913, and we find no action of the directors thereafter until June 4, 1913. At that meeting Andrews, Ulman, duPont, Boomer, Rhodes, Dunham and Streitwolf were present. They elected Strietwolf as a director. He was not a stockholder, but was a director in Andrews & Co. Dunham's status does not appear. Kiernan, realizing the circumstances under which the Albany subscriptions had been obtained, and that he was a party to obtaining them (he and Cogswell, an Albany banker, had been instrumental in obtaining ninety per cent

of them), at some time returned to them the amount they had paid to the company. This was not a payment by the company, but his voluntary act intended as an act of justice to his neighbors. But at this meeting the promoters took active steps to try and saddle the alleged value of their services and the moneys they had paid upon the plaintiffs. Every person at the meeting, aside from Dunham, was interested in transferring the losses from themselves to the company (which they knew had no resources) with the view of collecting them from the plaintiffs. They were not acting for the company but against it.

It is probable that the vote of the stock to Andrews and Boomer was intended for the benefit of all of the promoters, but if not the situation is not improved for the defendants. If Andrews and Boomer had all the common stock, the other directors had parted with their interest in the company and thereby disqualified themselves to act as directors. From the statements of Andrews to Kiernan, from the fact that Andrews, Ulman, Boomer, duPont and Rhodes held a so-called directors' meeting December 18, 1911, before the company was organized, and from all the facts in the case we are reasonably safe in concluding that those gentlemen were associates in the promotion and in the general scheme, and that Andrews represented them.

We may quote with profit from *McDowall* v. *Sheehan* (129 N. Y. 200, 207) (where directors were trying to enforce the statutory liability against stockholders): " The statute should not be so construed that the directors of a moribund corporation could constitute themselves creditors for salaries or wages, and thus impose liabilities upon confiding and innocent stockholders." It is not probable that in that case the result would have been changed if a receiver of the corporation had sought to collect the plaintiff's alleged debts from the stockholders.

In considering the rights and equities existing between the plaintiffs and the promoters, whose claim the receiver is trying to enforce against the plaintiffs, we conclude that the subscriptions of the plaintiffs were obtained by false and fraudulent representations; that the $1,000 required to be paid by the company as a condition for incurring an indebted-

ness was not paid until January 4, 1913; that the alleged claims of Andrews & Co., of Merry (who was seeking to recover the $25,000 paid for the option), of Rhodes and of duPont were claims against the promoters only, and that at the time the moneys were advanced, or the services rendered, the company had no right to incur any liability therefor, and the various acts of the directors relied upon were made in bad faith and against the interests of the company and are not binding upon it and that the alleged counterclaim is without force and should be dismissed.

The judgment should, therefore, be affirmed, with costs.

WOODWARD, J. (concurring):

The careful analysis of the evidence by the learned presiding justice makes any extended discussion of this case unnecessary; but it occurs to me that it may be proper to consider the 12th paragraph of the certificate of incorporation made on the 12th day of January, 1912, and which counsel for the appellants suggests is " not to be so lightly, so easily eliminated from this case," referring to the comment of the trial court that it is of no avail. To my mind this 12th paragraph is of vital importance, not for the purpose of reversing, but for the purpose of sustaining the judgment in this case. It sets the seal of fraud upon the transaction from this date at least. This paragraph reads as follows:

" *Twelfth.* It is within the contemplation of the incorporators that the directors will have occasion to take action with respect to matters in which they, or some of them, may be interested, either individually or as trustee for or representative of other persons. In the absence of actual fraud, no contract made or other action taken by the concurrent votes of a majority of the entire number of directors shall be invalid or voidable by reason of the fact that some or all of the directors are interested, nor shall any director be incapacitated from voting upon any such contract or with respect to any such action by reason of such interest."

Can there be anything clearer than that these incorporators, the promoters of the Hudson Hotel Company, were here laying the foundations for the fraudulent transactions which might be deemed necessary in the course of the enterprise? No

specific acts are suggested; simply broad generalities intended to relieve the directors named for the first year in the certificate of the ordinary duties, obligations and responsibilities of the office. It is a maxim of the law that " a person intending to deceive deals in general terms " (Broom Leg. Max. [8th Am. ed.] 289), and the same thought is expressed in that other maxim, *dolus latet in generalibus.* (14 Cyc. 828; Trayner Leg. Max.) In the paragraph here under consideration these promoters have sought to provide that in the " absence of actual fraud," as distinguished from constructive or implied fraud, they shall not be governed by the ordinary rules of law, and their transactions shall be valid, notwithstanding any contrary rules of law. And this agreement it is remembered was made at a time when it was proposed to name the particular directors for one year and to go out into the city of Albany and elsewhere and to sell the stock necessary to finance this hotel scheme. None of the prospective stockholders had any voice in this charter making; the promoters were agreeing among themselves that the affairs of this particular corporation in the absence of actual or legal fraud should be above the ordinary rules of law.

This view is not without " reason, argument or authority," as suggested by counsel; it has been recognized from the time " when the memory of man runneth not to the contrary " that "unusual clauses always excite suspicion." (Broom Leg. Max. [8th Am. ed.] 289; Whart. L. Lex. [12th ed.] 178; 11 C. J. 831; *State* v. *O' Neil,* 151 Mo. 67; *Baldwin* v. *Whitcomb,* 71 id. 651, 659; *Girard* v. *St. Louis Car-Wheel Company,* 46 Mo. App. 79, 97.) In the latter case, cited in *Baldwin* v. *Whitcomb* (*supra*), the court say: " Whenever fraud is the matter in issue, any unusual clause in an instrument, any unusual method of transacting the business, apparently done with the view for effect, and to give the transaction an air of honesty, is of itself a badge of fraud. For ' when the part is overacted the delusion is broken, and the fiction appears.' * * * This has been the rule ever since *Twyne's Case,* 3 Coke, 80-b." Not only did these promoters make use of the most general language, but while apparently frankly proclaiming an intention to do things not ordinarily done they seek by this most unusual provision to give effect which the law would deny to their

acts, and they carefully conceal this declaration in the 12th paragraph of a certificate of incorporation, which rarely comes to view except in the event of litigation. Fortified with this, they go out into the business community and solicit subscriptions to a fund to build a hotel well knowing that they have already appropriated to themselves through manipulation of the property selected as a site a large part of the possible profits of the enterprise.

It is true of course that no covenant of immunity can be drawn that will protect a person who acts in bad faith, because such a stipulation is against public policy, and the courts will not enforce it (*Industrial & General Trust, Ltd., v. Tod,* 180 N. Y. 215, 225), but this only serves to emphasize the rule and to give construction to the acts of the promoters of this hotel scheme. It is not what the law will prevent their doing, but what they have attempted to do, which characterizes their acts and determines the status of the parties in an action of this character. Andrews, Ulman and Rhodes, among the defendants now claiming compensation from the cash subscribers were among the incorporators of this company and participated in the laying of this foundation of fraud, while the other claimants are so intimately associated that it is difficult to believe that they were not fully aware of the fact that they were investing their time and money, not in the interests of the corporation, but in the promotion of their own individual ends. " The law requires the exercise of good faith, and no matter how strong the provision to shield from liability may be, there is no protection unless good faith is observed." (*Industrial & General Trust, Ltd., v. Tod, supra.*)

We find, therefore, not only that the 12th paragraph is not in the way of our sustaining this judgment, but that it makes for the conclusion reached by the learned presiding justice that the transaction is so honeycombed with fraud that it would be inequitable to permit of any recovery against the plaintiffs in this action on account of alleged expenditures of time or money in behalf of the corporation. Such expenditures were clearly made in the effort to promote the fraud, not in the interests of the corporation which was used merely as a convenient cover for the fraud and which appears never to have had a legal existence entitling it to incur indebtedness.

For these reasons in connection with those stated by the presiding justice, I concur in the affirmance of the judgment.

Judgment unanimously affirmed, with costs.

The court makes additional findings of fact as follows:

(A) The $1,000 required by the certificate of incorporation of the hotel company was never paid in in money or in property until January, 1913.

(B) The property covered by the Kiernan contract was not worth more than the amount unpaid thereon at the time that the directors of the company voted to take over the contract to the knowledge of all the directors present, and their act in voting away the common stock was without consideration, was in bad faith, not for the interests of the company, but was solely in their own interest.

(C) The alleged indebtednesses referred to in the counterclaim never were just debts against the company, but were for services and payments made solely in the interest of the promoters at a time when the company could not engage in business or have any benefit therefrom.

(D) The statements in the subscription paper signed by the plaintiffs that the company had acquired the Globe Hotel site and that it was to expend any part of the common stock for the purposes mentioned in said subscription paper, were untrue and were known to be so by the directors who prepared said paper and caused it to be prepared and submitted to the plaintiffs and the plaintiffs relied on said statements in making their subscriptions.

(E) The various actions taken by the board of directors were voted by directors who as promoters were interested in the action taken and the alleged corporate acts were intended by them to benefit themselves and the promoters rather than the company and are not valid acts of the company.