CONNERS v. BUCKSPORT NAT. BANK.

(District Court, D. Maine. March 16, 1914.)

No. 693.

1. BANKRUPTCY (§ 166*)—PREFERENCES—KNOWLEDGE OF INSOLVENCY.

In a suit by a bankrupt's trustee against a bank to recover an alleged preference, evidence that the bankrupt's checks had been protested prior to March, 1910, and also in October and November, before the mortgages constituting the alleged preferences were executed late in the latter month, was sufficient to put the bank on inquiry as to the bankrupt's solvency.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

2. BANKRUPTCY (§ 166*)—PREFERENCES—INSOLVENCY—REASONABLE CAUSE TO BELIEVE—EVIDENCE.

Where a bankrupt during 1910 had often overdrawn his bank account, and the bank knew he owned no real estate, and that his crops and animals were largely mortgaged, and in November, prior to the execution of certain mortgages alleged to constitute preferences, the president of the bank ascertained that the bankrupt had forged the names of indorsers to certain of his notes discounted at the bank, such facts were sufficient to give the bank reasonable cause to believe that the bankrupt was insolvent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. § 166.*]

3. CHATTEL MORTGAGES (§ 47*)—VALIDITY—DESCRIPTION.

Where a mortgage described the property as "3,500 bushels of marketable potatoes in the potato storehouse near the B. & A. R. R. Station at Winterport," but pointed out no method of locating the potatoes in the storehouse, it was insufficient to transfer the title to the mortgagee as against subsequent mortgages conveying the same property and bills of sale transferring the mortgagor's equity of redemption.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 87, 88, 96–103; Dec. Dig. § 47.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by Charles P. Conners, trustee in bankruptcy of the estate of John I. Frederick, against the Bucksport National Bank. Judgment for complainant.

Bertram L. Fletcher, of New York City, Lauren M. Sanborn, of Portland, Me., and J. Richard Larkin, of Boston, Mass., for complainant.

Fellows & Fellows, of Bangor, Me., and Frank Fellows, of Portland, Me., for defendant.

HALE, District Judge. This bill in equity seeks to set aside two chattel mortgages dated November 28, 1910, and lawfully recorded November 29, 1910, alleging them to be preferences under the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]). The bill also seeks to set aside as preferences the sale of the equity of one of the mortgages dated January 14, 1911, and duly recorded January 19, 1911, and the sale of the equity in the other mortgage, together with other equities dated January 24, 1911, and duly recorded January 28, 1911; all these alleged preferences being given by the bankrupt, John I. Frederick, to the Bucksport National Bank; all these mortgages and sales being dated and recorded within four months prior to the date of the filing of the involuntary petition in bankruptcy against said Frederick, namely, February 6, 1911. The proofs show that on November 28, 1910, the bankrupt gave to the bank the two chattel mortgages in question; one of the mortgages was for the express consideration of $1,500, and purported to convey to the bank "all my personal property situated in the said town of Winterport." It was made to secure "the amounts due said Bucksport bank on notes now held by said bank and deposited to the account of said John I. Frederick, according to the tenor of said notes now deposited at said bank." The second chattel mortgage of the same date was for the express consideration of $4,850, and purported to convey to the bank "ten thousand bushels of potatoes now contained in the potato house situated in said Winterport near the Bangor & Aroostook Railroad station, said potatoes being in bins numbered 1 to 12, inclusive." This mortgage was to secure the sum named "according to the tenor of five certain promissory notes now held by said bank, a more particular description of which is hereby attached and made a part of this instrument." In both these mortgages the bankrupt warranted the property "against the lawful claims and demands of all persons." The proofs show further that on January 14, 1911, the bankrupt made to the bank, for the express consideration of $1 and other valuable considerations, the sale of "twenty-five thousand bushels of potatoes in potato storehouse at Bangor & Aroostook R. R. station in Winterport in bins 1 to 10, inclusive, hereby releasing all interest in mortgage to these grantees, recorded in town clerk records of Winterport, Maine, Book 6, pages 3, 4 & 5, and conveying all other potatoes in said bins whatsoever the source of title." The sale contained the following clause, namely, "I hereby warrant the same to be free from incumbrance." On January 24, 1911 (as the proofs further show), the bankrupt made to the bank, for the ex-

press consideration of $1 and other valuable consideration, a sale of "all the personal property described in mortgage given by me to said Bucksport National Bank, dated November 28, 1910, recorded in records of the town of Winterport, Book 6, pages 1 & 2; also all equity I have in and to other personal property mortgaged by me to these grantees, recorded in said records, Book 4, page 86; also all equity in and to the personal property mortgages to C. W. Conant & Co., which mortgage is recorded in the records of the town of Winterport, Book 5, pages 278, 279 & 280."

The answer admits that on November 28, 1910, the bankrupt was indebted to the bank in the sum of $15,697.54, and on January 14, 1911, in the sum of $17,302.11. The answer denies the insolvency of Frederick at the time of the alleged conveyances; or, if he was insolvent, that the bank knew of his insolvency; or that it had notice sufficient to put an ordinarily prudent man on inquiry as to the bankrupt's solvency. It denies that any property was conveyed by the bankrupt to the bank by the two chattel mortgages, or by the two sales in question. It denies that the two mortgages and two sales were given to secure pre-existing debts; or that they were voidable preferences.

The proofs lead the court to the inquiry whether, under the provisions of section 60b, such proofs entitle the trustee to recover any or all the property alleged to be transferred by the bankrupt, as set forth in the bill in equity on the ground that such alleged transfers constituted voidable preferences. The act defines such preference, so far as is applicable to this case, as: (1) A transfer of property; (2) within four months of the filing of the petition in bankruptcy; (3) by a person who is insolvent; (4) the party to whom the transfer is made shall then have reasonable cause to believe that the enforcement of such transfer would effect a preference, or, in other words, "will enable the creditor, to whom the transfer is made, to obtain a greater percentage of his debt than any other such creditors of the same class."

When these essential elements are found in a transaction between a bankrupt and his creditors, such preference shall be "voidable by the trustee; and he may recover the property, or its value."

1. The proofs leave me in no doubt that, within the meaning of the Bankruptcy Act, the bankrupt was insolvent on November 28, 1910, on January 14, 1911, and on January 24, 1911, the dates of the alleged transfers. Without going into the details of the proofs it is enough to say that they lead me to the clear conclusion that on November 28, 1910, Frederick owed substantially $100,000, and that his assets were of value not exceeding $30,000.

[1] 2. Did the bank know, or by the exercise of reasonable diligence could it have known that the bankrupt was insolvent at the time the mortgages were given to the bank on November 28, 1910, and also at the time of the alleged sales on January 14, 1911, and January 24, 1911?

A sharp contention is made upon this point. It is urged with great earnestness and ability by learned counsel for the bank that complainant has not met the burden of showing that at the time of giving the

214 F.—54

mortgages, and of making the sales, the bank knew of the insolvency of the bankrupt, or had any reason to believe he was insolvent. It is urged that, although many of the bankrupt's checks had been protested in October and November, before the mortgages were made late in November, this fact should have very little probative value, inasmuch as, throughout the whole course of dealing with the bank, the bankrupt had been slow in payments and had been accustomed to have his checks protested before payment. The proofs show that many of Frederick's checks had been protested prior to March, 1910, and that this course of dealing was maintained up to the time the mortgages were given. Although the bank for a long time had been accustomed to protest the checks of the bankrupt, it cannot be held that the reasoning of ordinary business men was abandoned by the bank. The protest of checks, however long continued, must be held to put a bank upon inquiry. Pittsburgh Plate Glass Co. v. Edwards, 148 Fed. 377, 78 C. C. A. 191.

[2] It appears also from the proofs that the bank officials knew that during the year 1910 the bankrupt often overdrew his bank account; that he owned no real estate; that he had 160 acres of potatoes planted; that he had mortgaged a large portion of his growing crops; that he owed large sums for fertilizer; that his horses were mortgaged; and that his potato house was mortgaged. The proofs convince me that the familiarity of the bank with the affairs of the bankrupt must be held to charge it with knowledge that, at the time the mortgages were given, the bankrupt owed nearly $100,000, and that his assets must be very much less than that sum. On November 25, 1910, a note for $1,500 held by the bank fell due, the note purporting to be signed by one Grant and his wife, of Winterport; the Grants received notice from the bank on the morning of November 26, 1910; Grant telephoned Gilmore, president of the bank, on Sunday, November 27th. Mr. Gilmore testifies that Mr. Grant told him on that day that he and his wife had never signed the note; and on Monday, November 28th, Mr. Gilmore called on Mr. Grant, and said that the bankrupt had acknowledged the forgery, and given the bank security on potatoes and other things. The knowledge of Gilmore, the president, relating to the bankrupt's situation, must be imputed to the bank. Taken in connection with all other testimony, the fact of the forgery must be held to have constituted reasonable cause to believe that Frederick was insolvent.

The proofs, taken together, leave me in no doubt that on November 28, 1910, on January 14, 1911, and on January 24, 1911, the bank had reasonable cause to believe that the bankrupt was insolvent. It clearly had evidence in its possession sufficient to put it upon inquiry; and due inquiry must have led to the assurance that the bankrupt, at the times alleged, was in a bankrupt condition. McElvain v. Hardesty, 169 Fed. 31, 94 C. C. A. 399; English v. Ross (D. C.) 140 Fed. 630; In re Coder, 152 Fed. 951, 82 C. C. A. 99.

[3] 3. Was there a transfer of property of the bankrupt to the bank by the two mortgages of November 28, 1910, and by the two conveyances of January 14, 1911, and January 24, 1911?

Here the defendant makes a sharp contention. It urges that the property sought to be transferred was already the property of the bank, and was not the property of the bankrupt. The proofs show that on January 31, 1911, the potato house at Winterport was burned, with its contents; that at that time the bank had 28,500 bushels of potatoes in the burned house. It is unnecessary to enter into the details of the proofs upon this point. They are full and convincing as to the amount of the potatoes in the house at the time of the fire. The bank sets up in its answer and claims that, under the proofs, it has shown, that the title to the potatoes in the potato house was not derived from the mortgages and sales alleged in the bill of complaint. It urges that it obtained title to 3,500 bushels of potatoes by virtue of a mortgage from Frederick to the bank on October 3, 1910; and hence it is not accountable for this property to the trustee in bankruptcy. Upon an examination of the mortgage of October 3, 1910, it is found that the description contained in such mortgage is indefinite. The mortgage describes "3,500 bushels of marketable potatoes in the potato storehouse near the B. & A. R. R. station at Winterport." No way is pointed out of locating the potatoes in the potato house; they are not described as being in any particular bins, or in any special location in the house. There is no method of designation by which the potatoes could be identified or could be found. Afterwards, on November 28th, by the mortgage of November 28th, the bankrupt warranted title to the potatoes conveyed in the sale of January 14, 1911; Frederick warranted the potatoes free from incumbrance. The whole proofs, taken together, lead me to the conclusion that the complainant has met the burden of proving that the mortgage of November 28, 1910, and the sale of January 14, 1911, gave the bank a good title to the potatoes in bins 1 to 12, inclusive, in the Winterport potato house notwithstanding the mortgage of October 3, 1910. Thurlow v. Dresser, 98 Me. 161, 56 Atl. 654; Jones on Chattel Mortgages, §§ 55a, 56; Northwestern Bank v. Freeman, 171 U. S. 620, 19 Sup. Ct. 36, 43 L. Ed. 307; Stimpson v. Thomaston Bank, 28 Me. 259.

The bank further alleges in its answer that it obtained title to 10,000 bushels of potatoes from Lewis E. White by virtue of an agreement between White and Frederick dated September 27, 1910, and by virtue of transfers and assignments of this agreement from Frederick and White to the bank. An examination of the proofs leads me to the conclusion that the agreement between White and Frederick was a chattel mortgage under the laws of Maine, and was so regarded by both White and Frederick. Kelley v. Goodwin, 95 Me. 538, 50 Atl. 711; Hill v. Nutter, 82 Me. 199, 19 Atl. 170; R. S. of Maine, c. 113, § 5.

The proofs show that practically all of the White potatoes were in the Winterport storehouse when the instrument was drawn. White says he knew his potatoes were mixed with other potatoes hauled to Frederick. By the terms of the chattel mortgage, Frederick was to procure an insurance upon the potatoes; he had made distinct promises in reference to the amount he should pay White for them. It appears from the testimony of White that Frederick partially paid him for the potatoes; that he paid $500; and after November, 1910, the bank's answer says the bank paid White $4,000 for the White potatoes. The

bank contends that it paid more than the $4,000; but the evidence upon this point is unsatisfactory.

The proofs lead me to the conclusion that Frederick paid one-ninth of the White potatoes, $500, and that the bank paid eight-ninths of the price, or $4,000. As regards the one-ninth of the potatoes delivered by White, into the storehouse, the bank can make no claim that it received title from White. The bank, then, can fairly claim that, by virtue of the payments made by it to White, it acquired title to 8,889 bushels of potatoes. The proofs show that when the bank took the assignments from Frederick and White, dated December 1, 1910, and January 14, 1911, it knew that the White potatoes had been delivered into the Winterport potato house; that the title of the potatoes passed to Frederick by virtue of the recorded mortgage from Frederick to White, and the oral sale from White to Frederick preceding the mortgage. The bank's attorney, Bowden, was looking after its potatoes; he knew that the White potatoes were being mixed with the Frederick potatoes. The proofs show that he had this knowledge as early as October 1st, and must have known it at the time of the assignment December 1, 1910. The bank, therefore, is charged with knowledge of it at that time. Bowden drew the original agreement between Frederick and White on September 27, 1910. These potatoes, which are spoken of as the "White potatoes," were practically all in the potato house at the time of the sale of Frederick's property in Winterport from Frederick to the bank on November 28, 1910. By the mortgage of that date, the bank obtained title to all of the White potatoes subject to White's chattel mortgage of November 27, 1910. By taking an assignment of the mortgage and paying White $4,000, the bank claims to be subrogated to White's rights. Deducting the proportion of the potatoes belonging to White which the bank paid for, namely, 8,889 bushels, from the 28,500 bushels which the bank had at the time of the fire, there remain 19,611 bushels belonging to the bank, by virtue of the two mortgages from Frederick, dated November 28, 1910, and the two sales in January, 1911. It is claimed on behalf of the bank that Bowden transferred to the bank 4,500 bushels of potatoes; hence that the amount covered by the mortgages in question, of November 28, 1910, and of the sales of January, 1911, should be diminished by this amount. Without entering into a discussion of the testimony upon this point, it is sufficient to say that the court is not satisfied with the proofs. The transfer is not claimed in the answer of the bank and is not sustained by the proofs in the case.

The bank claims, too, that it acquired title to certain potatoes in the storehouse by virtue of its mortgage to L. W. Frederick, dated July 25, 1910, and assigned to the bank on the same day. The bank made no contention in its answer that it acquired title to these potatoes under this mortgage. The proofs are unsatisfactory and insufficient to show that the bank acquired title to these potatoes as claimed by it under the Frederick mortgage of July 25, 1910. With reference to certain other claims made by the bank to reduce the amount of property transferred by the mortgages of November 28, 1910, and sales of January, 1911, it is sufficient to say that the proofs do not sustain the contention of the bank. The court finds, then, that, out of the 28,500

bushels of potatoes in the Winterport storehouse at the time of the fire the bank acquired title to 19,611 bushels of potatoes by virtue of the two chattel mortgages of November 28, 1910, and the two sales of January 14, 1911, and January 24, 1911. The court cannot sustain the contention of the learned counsel for the bank that no property in any potatoes passed to the bank from Frederick by virtue of the mortgages or by the sales.

It appears by the testimony that the potatoes were worth in Winterport on November 28, 1910, and on January 14, 1911, 35 to 40 cents per bushel. They were paid for by the insurance companies at the rate of 40 cents per bushel. It is clear that these potatoes were not worth less than 35 cents per bushel; and the court will adopt this price. The 19,611 bushels at 35 cents a bushel amount to $6,863.85.

4. Were the mortgages of November 28, 1910, made within four months prior to the filing of the petition in bankruptcy, or February 6, 1911? And were they given solely to secure pre-existing debts? Were they, then, voidable preferences?

On the face of them, these conveyances were made for the purpose of securing definitely described debts. No question is made but that the mortgages were duly and lawfully recorded within the four months before bankruptcy. Without discussing the proofs in detail, it is enough to say that they are convincing that the conveyances were made to secure pre-existing indebtedness. I have already discussed the transaction with White. I cannot sustain the contention of the defendant with reference to this transaction. The money paid him cannot be treated as part consideration for the conveyances.

5. The proofs leave no doubt that the effect of the two mortgages of November 28, 1910, and the two sales of January 14, 1911, and January 24, 1911 (all of these conveyances having been duly recorded), was to enable the defendant bank to obtain a greater percentage of its debt than other creditors of the same class. The trustee, Conners, testified that no assets whatever have come into his hands; and that he has been unable to discover any. The referee testifies that the general creditors filed claims against the bankrupt estate for $26,946.71; and that one priority creditor filed a claim of the amount of $20.60.

6. I have already found that the value of the property transferred from Frederick to the bank by the two mortgages of November 28, 1910, and the two sales in January, 1911, was $6,863.85.

A decree may be entered for the complainant that both the said mortgages of November 28, 1910, and the two conveyances of January 14, 1911, and January 24, 1911, be set aside and declared void; that the value of the property obtained by the defendant in consequence of the said mortgages and conveyances is decreed to be $6,863.85; and that said sum be paid to the said complainant as damages, together with interest from the filing of the bill of complaint, to wit, May 15, 1912.

The complainant may file a draft decree on or before April 2, 1914.
Defendant may file corrections on or before April 11, 1914.
Decree to be settled April 20, 1914, at 10 o'clock in the forenoon.
The complainant is to recover costs.