WATCHMAKER v. BARNES. LEVI v. SAME. RUDNICK v. SAME (two cases). MELTZER v. SAME.

(Circuit Court of Appeals, First Circuit. June 18, 1919.)

Nos. 1391, 1393-1396.

1. APPEAL AND ERROR ⊂∽1008(2)—REVIEW—TRIAL TO COURT WITHOUT JURY.
Where actions at law were tried to the court, jury being waived, findings of the court cannot be reversed on error, unless they are clearly wrong, because not sustained by any view of the evidence, or were induced by mistaken view of the law.

2. BANKRUPTCY ⊂∽166(4)—PREFERENCE—NOTICE.
Knowledge that a bankrupt who makes a payment to or on behalf of a creditor has committed forgery is notice of a fact which would incite a person of reasonable prudence to inquiry, and must be deemed notice of all facts which a reasonably diligent inquiry would disclose for the purpose of determining whether the payment was preferential within Bankruptcy Act July 1, 1898, § 60 (Comp. St. § 9644).

3. BANKRUPTCY ⊂∽164—PREFERENCE—RECOVERY.
Where indorsers of notes who had rediscounted them induced the bankrupt to pay the same, the trustee in bankruptcy may recover such payments from the indorsers as preferences within Bankruptcy Act July 1, 1898, § 60 (Comp. St. § 9644), provided the indorsers had reasonable cause to believe, when payments were made, that the bankrupt was insolvent, etc.

4. BANKRUPTCY ⊂∽303(3)—PAYMENTS—PREFERENCE.
In a suit by trustee in bankruptcy against one who discounted for the bankrupt notes bearing forged indorsements, evidence held to show that the payments were preferential within Bankruptcy Act July 1, 1898, § 60 (Comp. St. § 9644); the defendant knowing before payment of the forged indorsements.

5. BANKRUPTCY ⊂∽159—OBTAINING PROPERTY BY FRAUD—GENERAL CREDITOR.
Though bankrupt obtained defendant's money by fraud, yet defendant had a claim against him provable in bankruptcy proceedings, and was a creditor.

6. BANKRUPTCY ⊂∽164—"PREFERENCE"—WHAT CONSTITUTES.
Where defendant, who discounted a note for the bankrupt, discovered on the following day that an indorsement was forged, and called on the bankrupt to return the money, held that where the bankrupt was unable to do this, and defendant accepted a postdated check, which was shortly paid, the transaction was preferential, within Bankruptcy Act July 1, 1898, § 60 (Comp. St. § 9644), and cannot be upheld on the theory that defendant was merely procuring a return of his money, for by accepting a postdated check, which was paid from the bankrupt's general funds, defendant became a general creditor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Preference.]

7. BANKRUPTCY ⊂∽164—TRANSFERS—WHEN CONSUMMATED.
Where a creditor of a bankrupt accepted a postdated check, the transfer of the bankrupt's property occurred, not on delivery of the check, but on payment of the same.

8. BANKRUPTCY ⊂∽166(4)—PREFERENCE—WHAT CONSTITUTES.
Under Bankruptcy Act July 1, 1898, § 60, as amended by Act June 25, 1910 (Comp. St. § 9644), it is not a necessary element of a preference that the party receiving a payment from the bankrupt or benefiting thereby should have reasonable cause to believe that a preference was intended.

⊂∽For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. BANKRUPTCY ⊚═467—REVIEW—AGREED STATEMENT OF FACTS.**

In a suit by the trustee in bankruptcy to recover an alleged preferential payment, where the circumstances under which the payment was made were set out in the agreed statement of facts, and the parties proceeded in the submission of the facts upon the idea that the court should draw such inferences as were warranted and necessary, the Court of Appeals may dispose of the case by drawing such inferences as are necessary.

**10. BANKRUPTCY ⊚═303(3)—PREFERENCE—ACTION.**

In action by the trustee in bankruptcy to recover alleged preferential payments, the finding of the trial court that the payments were preferential and were induced by threats on the part of the creditor, after discovery that indorsements on the notes discounted were forgeries, *held* warranted.

**11. BANKRUPTCY ⊚═303(3)—PREFERENCE—PAYMENT.**

In a suit to recover payments made on notes which defendant had rediscounted, evidence *held* sufficient to show that one of the defendants knew of the fact that indorsements on the notes had been forged, and communicated such fact to his codefendant, and that payments which the bankrupt was induced to make by promise of further credit were preferential.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Actions by Clarence A. Barnes, trustee in bankruptcy, against Isaac Watchmaker, against Louis S. Levi, against Abraham G. Rudnick, against Benjamin Rudnick, and against Michael I. Meltzer. There were judgments in each case for the trustee, and each defendant brings error. Judgment affirmed in each case.

Abraham K. Cohen, of Boston, Mass. (David M. Watchmaker, of Boston, Mass., on the brief), for plaintiff in error Watchmaker.

Charles H. Dow, of Boston, Mass. (Samuel Sigilman, of Boston, Mass., on the brief), for plaintiff in error Levi.

David Stoneman, of Boston, Mass. (C. S. Hill, of Boston, Mass., Elijah Adlow, of Roxbury, Mass., and Stoneman, Gould & Stoneman, of Boston, Mass., on the brief), for plaintiffs in error Rudnick and Meltzer.

Clarence A. Barnes, of Boston, Mass. (White & Barnes, of Boston, Mass., on the brief), for defendants in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. In each of the above actions, the plaintiff, the defendant below, and hereinafter called the defendant, seeks a review of a judgment recovered in action at law by the trustee in bankruptcy of David M. Rubin, under the provisions of section 60b of Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562, as amended by Act June 25, 1910, c. 412, § 11, 36 Stat. 842 [Comp. St. § 9644]), which, so far as it relates to the matters in issue, is as follows:

"If a bankrupt shall * * * have made a transfer of any of his property, and if, at the time of transfer, *. * * and being within four months before filing of the petition in bankruptcy, * * * the bankrupt be insolvent and the ·* * * transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall

then have reasonable cause to believe that * * * such * · * * transfer would effect a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person."

Under section 60a of the same act, as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (Comp. St. § 9644), a preference is defined as follows:

"A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

[1] A jury trial was waived in each case, and in each the learned judge of the District Court found that all the essentials to a recovery by the plaintiff were either admitted or proved by uncontradicted evidence, except whether, at the time when the payments were made, the several defendants knew that Rubin had committed forgery; and if they did know, whether this knowledge in connection with all facts shown to have been known to them, or which it could reasonably be inferred were known to them, furnished reasonable cause to believe him to be insolvent, and that the payments made by him would effect a preference. Upon these questions he found for the plaintiff. His findings cannot be reversed unless they are clearly wrong, because not sustained by any view of the evidence or inferences which might reasonably be drawn therefrom or induced by a mistaken view of the law.

It appeared at the trial that Rubin had been engaged in the wholesale coal business in Chelsea, Mass., for several years under the name of the Chelsea Iron & Coal Company; that he owed large sums of money to various banks, private money lenders, and other people; that he had borrowed large sums of money from time to time on promissory notes, to which he either forged the signatures or indorsements of some one of several relatives who were known to Rubin's creditors as responsible financially. Rubin testified that he was insolvent in 1914; that his condition grew worse, until in 1915 and 1916 it had become very desperate; that his assets were merely nominal, and he owed over $120,000 at the time of bankruptcy; that for over a year prior to his bankruptcy he had been forging extensively the names of various friends and relatives, and on the strength of said forgeries had obtained many thousands of dollars from about 40 different firms and individuals in Boston; that he had exhausted his credit at the banks in the spring of 1916 and was obliged to deal with various private money lenders, paying interest at the rate of from 1 to 3 per cent. a month, and in some cases bonuses in addition. A petition in bankruptcy was filed by his creditors on December 15, 1916, and he was duly adjudicated a bankrupt on January 9, 1917.

[2] Whether knowledge that Rubin had committed forgery, taken with all other testimony in each case, constituted reasonable cause to believe that he was insolvent when the payments were made by him of notes which had been discounted for him by the several defendants and upon which they were indorsers, and that these payments would

259 F.—50

effect a preference, was the principal question in all the cases, and its discussion and our conclusion will apply to all. That a debtor would commit the crime of forgery which, if detected, might subject him to severe punishment, would indicate to the ordinarily intelligent mind that his financial condition must be desperate, and leads us to the same conclusion as that reached by the learned district judge, that information that forgery had been committed by Rubin would incite in the mind of a reasonably intelligent man more than suspicion and furnish reasonable cause for belief that he was insolvent, as defined in the Bankruptcy Act, and that the payments made by him would effect a preference. What will constitute reasonable cause for belief under the Bankruptcy Act has been considered many times in both federal and state courts, but it is evident that no general rule could be laid down which would apply to every case, but that each must be decided upon its own facts and the circumstances surrounding them.

In Connors v. Bucksport National Bank, 214 Fed. 847, decided in the District Court of Maine, it was held that knowledge on the part of the bank that forgery had been committed by the bankrupt, taken in connection with all the other testimony, constituted reasonable cause to believe that the bankrupt was insolvent when he executed certain mortgages to the bank, and this finding was affirmed by this court 216 Fed. 990, 132 C. C. A. 90. In Putnam v. United States Trust Co., 223 Mass. 199, 204, 111 N. E. 969, the court held that knowledge that the bankrupt had committed forgery, taken in connection with other testimony in the case, furnished reasonable cause for belief that payments received by the bank would effect a preference. We think that knowledge that the bankrupt has committed forgery is notice of a fact which would incite a person of reasonable prudence to an inquiry under similar circumstances, and is notice of all the facts which a reasonably diligent inquiry would disclose. Farmers' State Bank v. Freeman, 249 Fed. 579, 161 C. C. A. 505; Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; Huttig Manufacturing Co. v. Edwards, 160 Fed. 619, 87 C. C. A. 521; Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; National City Bank v. Hotchkiss, 231 U. S. 50, 57, 34 Sup. Ct. 20, 58 L. Ed. 115.

[3] All the payments which the trustee seeks to recover in these actions, with but one or two exceptions, were made to banks in which the defendants had rediscounted the notes which they had discounted for Rubin. As indorsers upon the notes so paid they were benefited by these payments, and the trustee may recover such payments from them, provided they had reasonable cause to believe, when they were made, that Rubin was insolvent; that their payment would effect a preference; and that as found by the learned district judge in each case, which we think is sustained by the evidence, they had procured Rubin to make them. Swarts v. Fourth National Bank, 117 Fed. 1, 54 C. C. A. 387; Cohen v. Goldman, 250 Fed. 599, 162 C. C. A. 615; Kobusch v. Hand, 156 Fed. 660, 84 C. C. A. 372, 18 L. R. A. (N. S.) 660; Stern v. Paper (D. C.) 183 Fed. 228; In re Silvernail Co. (D. C.) 218 Fed. 979; Lazarus v. Eagen (D. C.) 206 Fed. 518; Paper v. Stern, 198 Fed. 642, 117 C. C. A. 346; National Bank of Newport v. Herkimer Bank,

225 U. S. 178, 32 Sup. Ct. 633, 56 L. Ed. 1042; Bartholow v. Bean, 18 Wall. 635, 2 L. Ed. 866; Landry v. Andrews, 22 R. I. 597, 48 Atl. 1036; Brown v. Streicher (D. C.) 177 Fed. 473.

The learned judge of the District Court has found that all the payments made by Rubin which the trustee seeks to recover in these actions were made from Rubin's general funds, which "were largely the proceeds of other forged notes which Rubin put out from time to time to meet notes coming due. In no case was the sum received on a note held separate and used to pay the note by which it had been obtained." The evidence upon which this finding was made has not been reported, but as it has not been questioned by counsel we accept it as fully sustained by the evidence.

## The Case Against Meltzer.

[4] The defendant Meltzer was engaged in the metal business in Chelsea for a number of years, and knew Rubin slightly, and the persons whose names appeared as indorsers upon his notes intimately. On July 24, 1916, he loaned Rubin $2,450 upon several promissory notes, signed or indorsed by Rubin and purporting to be signed or indorsed by several persons and firms known to the defendant to be men of financial responsibility. On November 1, 1916, two of these notes, one for $500 and the other for $250, became due. Rubin telephoned to the defendant that he would be unable to pay these notes, and asked for an extension, which was refused. He thereupon paid the $250 note, and the $500 note was protested. That night Rubin testified that he went to Meltzer's home, and asked him to renew the note for $500, and Meltzer said he did not want any further business with him and said:

"Pay that note and that other one that is coming due within a few days or else you will be in the hands of the police. I have already been over there with the note and also had one of the witnesses there and had the police over to one of the indorsers to verify it, and have got everything all in good shape. Now it is up to you and I have got nothing further to say."

A police inspector testified that on November 13, 1916, Meltzer made a complaint to police headquarters, that Meltzer went with him to the office of Frank Hershmann, one of the indorsers, and the alleged signature of Hershmann upon the note held by Meltzer was compared with genuine signatures of Hershmann and discovered to be a forgery. Between November 1 and November 14, 1916, Rubin paid $1,359 to take up certain notes which had been discounted for him by Meltzer, including the note for $500 which fell due November 1st, and the judgment which was rendered against Meltzer we think was fully sustained by the evidence.

## The Case Against Watchmaker.

[5, 6] It is admitted that Watchmaker discovered on the day after he had discounted a note of $500 for Rubin that the indorsement of one Frank Hershmann upon it was forged, and that he then called upon Rubin to return his money. This Rubin was unable to do, having deposited the money in his general account and used it to pay his bills.

He gave Watchmaker a check which was dated ahead three or four days and Watchmaker held the note. The check was paid upon its date, and the note was then surrendered.

It is claimed that such payment did not constitute a preference, but was simply a restitution of money which Rubin had fraudulently obtained from the defendant by forgery; that, under section 60a of the Bankruptcy Act, it is only a transfer which will "enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class" which will constitute a voidable preference, and that Watchmaker was not a creditor. Even though Rubin had obtained the defendant's money by fraud, yet he was under an obligation to restore it, and the defendant had a claim against him which was provable in bankruptcy and was a creditor. Clark v. Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. Ed. 953; Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Tindle v. Birkett, 205 U. S. 183, 27 Sup. Ct. 493, 51 L. Ed. 762; Crawford v. Burke, 195 U. S. 176, 193, 25 Sup. Ct. 9, 49 L. Ed. 147; Bush et al. v. Moore et al., 133 Mass. 198. By accepting a postdated check he had waived the tort, and relied upon the promise of Rubin to pay the check upon its date. The language of Justice Holmes in National Bank v. Hotchkiss, supra, is particularly in point:

"The consent to become a general creditor for an hour, that was imported, even if not intended to have that effect, by the liberty allowed to the firm, broke the continuity and established the loan as part of the assets. No doubt many general creditors have increased a bankrupt's estate by their advances, but they have lost the right to take them back."

If the money received by Rubin from Watchmaker had been upon deposit, even with the funds of Rubin, at the time when the forgery was discovered by Watchmaker and he called upon Rubin to return his money, it might be held, under the authority of Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693, Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047, Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981, and Hewitt v. Hayes, 205 Mass. 356, 91 N. E. 332, 137 Am. St. Rep. 448, that this deposit was impressed with a trust in favor of Watchmaker; but from the agreed statement of facts it appears that Rubin did not have $500 upon deposit at the time when Watchmaker called for a return of his money, and was forced to give the latter a postdated check, which was paid from his general funds in which Watchmaker had no greater interest than any other creditor. In re Mulligan (D. C.) 116 Fed. 715; Frelinghuysen v. Nugent (C. C.) 36 Fed. 229; Board of Com'rs v. Strawn, 157 Fed. 49, 51, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100.

[7] The transfer of the debtor's property took place, not at the delivery of the postdated check, but at the payment of the same. In re Lyon, 121 Fed. 723, 58 C. C. A. 143.

[8] On December 1, 1916, another note in the sum of $500, which had been discounted by Watchmaker for the bankrupt on August 1, 1916, matured, but Rubin was unable to pay the note, and called at the place of business of the defendant, and paid him the sum of $140 on account of the same, and later sent his check for $360, which has never

been paid. Counsel contends in argument that the agreed facts contain no statement that Watchmaker, when the payment of $140 was made, had reasonable cause to believe that a preference was intended or that he was by such payment to receive from Rubin any more than any other creditors of the same class, and that this court and the court below are not authorized to infer this fact from the agreed facts; but since the amendment of June 25, 1910, c. 412, § 11, 36 Stat. 842 (Comp. St. 1916, § 9644), it is not a necessary element of a preference that the party receiving a payment from a bankrupt, or benefited thereby, should have had reasonable cause to believe that a preference was intended.

[9] Whether by such payment Watchmaker had reasonable cause to believe that he would receive from Rubin any more than any other creditors of the same class was a fact which could be inferred by the court from the agreed facts. The circumstances under which the payment was made were set out in the agreed statement of facts, and we think that the record shows that the parties proceeded in the submission of the facts upon the idea that the court should draw such inferences from them as were warranted and necessary to a proper disposition of the case, and such is the practice in this circuit. Flanders Motor Co. v. Reed, 220 Fed. 642, 136 C. C. A. 250; compare Public Acts Mass. 1913, c. 716, § 5.

## The Case Against Levi.

[10] The evidence in the case against Levi showed that he was engaged in the real estate and money lending business, and that he had no acquaintance or business dealings with Rubin until on or about August 16, 1916, when, at Rubin's request, at his office in Boston, he discounted for him two notes of $500 each, in which Rubin, under the name of the Chelsea Iron & Coal Company, was payee, and on which there were several indorsers, including one Hershmann; that the dates of maturity of these notes were November 14 and December 14, 1916, respectively; that he never discounted any other notes for Rubin, and never met him again until November 14, 1916, when one of the notes fell due. The maker of this note was the Star Waist Company, of which Philip Bromfield, a brother-in-law of Rubin, and also a brother-in-law of Frank Hershmann, one of the indorsers of the note, was the treasurer. Rubin testified that on the date of the maturity of that note he went to Levi's office at about 3 o'clock in the afternoon, and told him he had been trying very hard to get money to pay the note, and asked him for a renewal or an extension of time of payment for a week or ten days, which the defendant refused, saying that he had telephoned to the Star Waist people and found their telephone disconnected, and "it is a funny kind of a deal anyway"; that while he was in the defendant's private office Frank Hershmann, whose name appeared as an indorser on the notes, came in. Levi showed him the note then due, and Hershmann denied his signature. After Hershmann left, Levi insisted that Rubin had better make arrangements to pay the note, and that when Rubin called his attention to the fact that the time was after banking hours, Levi said:

"I will telephone up to the bank and arrange with them to hold that note over for you all the afternoon, for that matter, and you had better get busy."

He testified that he pleaded with Levi for a renewal or extension, and he said:

"I don't want to listen to that kind of stuff; I insist on getting my money. It is a funny thing; if you don't pay these notes I am going to place it in the hands of the police. I will telephone up to the bank that they will receive your money any time this afternoon up to 5 o'clock."

Rubin testified that he managed to get the money and paid the note at the bank that afternoon.

Levi testified that upon November 14th he was informed by the bank in which the note had been deposited that it had not been paid; that he then told his bookkeeper, a young woman, to telephone the maker of the note; and, being informed that the telephone was disconnected, he told her to telephone Rubin, and, being unable to get Rubin, she called Hershmann, by Levi's direction, and he talked with Hershmann on the telephone, telling him that a note made by the Star Waist Company, and bearing Hershmann's indorsement, was due that day and unpaid, and asking Hershmann what he wanted to do about it, saying he must notify the bank within a few minutes whether the note should be protested. Hershmann said he was busy then, and Levi told him that if he wished he would come down to Hershmann's office, but Hershmann said, "No; I will come right up to your office; I will be there in about 10 or 15 minutes;" that before Hershmann arrived at Levi's office Rubin arrived and paid the note. Levi further testified that when Hershmann came to his office he said to him, "The note that you came up to see, that you indorsed on, is paid." He denied that Rubin, when he called upon him, made any plea for an extension of time on account of financial embarrassment, or that he told him that he knew there was anything wrong with the indorsement on the notes, and that Rubin paid the note at his office a little after 3 o'clock.

There was conflicting evidence as to what occurred at Levi's office after Hershmann came there on the afternoon of November 14th, and also in regard to the talk over the telephone between Levi and Hershmann before the latter went to Levi's office. Hershmann testified that he told Levi that his indorsement upon the note was a forgery. This was denied by Levi, who said that Hershmann only told him that he would come right up to the office, and that when he did come up the only thing he said was, "It is all right," or words to that effect, and that Hershmann left without any further talk.

The learned district judge saw the witnesses and could judge of their credibility. He has found that the testimony of Hershmann as to the conversation over the telephone and what occurred at Rubin's office was true, and we feel this finding is fully sustained by the evidence, and that he was justified in finding that Levi had knowledge of this forgery before this note was paid, and, having this knowledge, he procured by threats the payment of both of the notes discounted by him.

The Cases Against the Rudnicks.

[11] Abraham G. Rudnick is the father of Benjamin Rudnick. Rubin testified he began doing business with the elder Rudnick in the early part of the summer of 1916; that he had paid this defendant interest a little in excess of 1 per cent. per month; that some time in the summer of 1916 Abraham G. Rudnick discounted two notes for him for $500 each, which matured, one on the 20th and the other on the 25th day of November, 1916; and that the names of all the indorsers on these notes were forged. Some time in July, 1916, the son, Benjamin Rudnick, discounted two notes for Rubin, one for $400, maturing November 20, 1916, and the other for $500, maturing at a later date; and Rubin testified that all the signatures and indorsements upon these notes were forgeries.

On November 20, 1916, when one of the notes for $500, discounted by the father, and the note of $400, discounted by Benjamin, fell due, they were both protested for nonpayment; and on the evening of that day Benjamin Rudnick made an appointment with Rubin over the telephone to meet him the next day. When they met Rubin told Benjamin that he was in no position to take up these notes; that he was pressed for money and could not get it. Benjamin told him that he knew he was in bad shape, but that the notes must be paid, and promised that his father would make him a further loan of at least $1,000 if he would pay these notes, and said to him:

"You can take me at my word. All you have got to do is simply to go out and see if you can get this money, and when these notes are paid there is no question but that father will give you that $1,000."

There was evidence that he also stated that all notes that were discounted by his father were approved by him. After this conference Rubin paid to Benjamin $500, to be paid to his father, and $175 upon the note for $400, discounted by Benjamin; and on November 25th, when the other note of $500, which had been discounted by Abraham, matured it was paid by Rubin at the bank where it had been rediscounted by Abraham; and the note of $500 was paid at maturity at the bank where it had been rediscounted by Benjamin; so that both the notes of $500 each, which had been discounted by Abraham, were paid, and also the note of $500, which had been discounted by Benjamin, and the latter also received $175 on account of the $400 note which he had discounted.

There was evidence that one A. K. Mann, who was one of the indorsers upon these notes, met Benjamin Rudnick between the 1st and 5th of November, and told him that if he had any notes bearing his indorsement that such indorsement was a forgery. Benjamin Rudnick did not deny that he had such a conversation with Mann, but claimed that it was in the latter part of November, and not in the early part of November.

Rubin testified that when he took up with Abraham Rudnick the proposition of the loan of $1,000 in the way of renewal, the latter said that his son had advised him not to renew, and he refused to do so; that he then saw the son Benjamin, who had assured him that his fa-

ther would make this loan if he would pay the notes which matured upon November 20th, and Benjamin said:

"You ought to consider yourself fortunate that you are able to pay these; otherwise you would have been in a very, very bad fix. I don't care a rap about any of the indorsements upon these notes; the indorsements are questionable."

This statement furnishes strong evidence of his knowledge of Rubin's forgeries, as it was made after Meltzer had laid the matter of Rubin's forgeries before the police department, and Levi had learned from Hershmann on November 14th that his indorsement had been forged, and after Mann testified he had told him that his indorsement had been forged.

We think there was sufficient evidence to warrant the learned district judge in finding that Benjamin Rudnick knew, on November 20, 1916, that Rubin had been forging. We also think there was sufficient evidence to support the finding that Benjamin Rudnick was acting as the agent of his father in the receipt of the payment of $500 from Rubin, and that, in view of the relationship that existed and the testimony of Rubin that Benjamin said that he approved notes discounted by his father, and that the father, when applied to for a further loan of $1,000 in the way of renewal, said that he would have to consult with his son, the inference could be fairly drawn by the court below that the information which Benjamin had in regard to Rubin's forgeries was communicated to the father. This statement in the opinion of the learned district judge we think was warranted by the evidence:

"All the payments in this case were made three weeks or more after the forged Meltzer note had gone to protest, and a week after Meltzer had been to the police about it, at a time when a number of persons with whom Rudnick would be likely to come into contact knew Rubin had been forging. Such knowledge spreads fast. There is no denial of Mann's evidence that he inquired at the Tremont Trust Company about notes bearing his name, as he says he did; such an inquiry would more naturally be made before protest notices were received than afterwards. Rudnick displayed an anxiety about the notes easily explainable if he thought they were forgeries, and not easily otherwise.

"While the case is not free from doubt, in my opinion Benjamin Rudnick, on November 20th, believed that Rubin had been forging, and that the notes held by himself and his father were probably forgeries; and I so find. Instead of endeavoring to collect by threats or force, he adopted the policy of doing so by holding out to Rubin illusive assurances of further loans if those then due were promptly paid. In this way he obtained for himself and his father (or to the banks for their benefit) the payment here in question. I do not for a moment believe that the son's knowledge and suspicions on this matter, and what he was doing with reference thereto, were not communicated to his father. I accordingly find that the defendants, A. G. Rudnick and Benjamin Rudnick, at the time when each of the payments above referred to was made, had reasonable cause to believe that Rubin was then insolvent, and that the sums in question must be returned to the trustee."

We think there was evidence to warrant a finding that Benjamin Rudnick, acting for himself and as agent for his father, procured Rubin to make the payments of the notes which both he and his father had discounted and upon which their names appeared as indorsers. As they were creditors and were benefited by these payments, judgment was properly rendered against each of them for the amount of the

payments made by Rubin on account of the notes which each had discounted.

The judgment of the District Court is affirmed in each case, with costs in this court to the defendant in error.