Walter A. KELLEY, Trustee in Bankruptcy of Charles G. Rhodes, Bankrupt, Plaintiff,

v.

NATIONAL SURETY CORPORATION, a Corporation, Defendant.

Civ. A. No. 968.

United States District Court
S. D. West Virginia,
at Huntington.

Sept. 15, 1960.

**330**

John E. Jenkins and John E. Jenkins, Jr., Jenkins & Jenkins, Huntington, W. Va., for plaintiff.

Luther E. Woods, Jr., Campbell, Mc-Neer, Woods & Bagley, Huntington, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

, This is an action to set aside a preferential transfer of property under 11 U.S.C.A. § 96, commonly known as the Bankruptcy Act, subsection a(1) of which reads as follows:

"A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

As to the results of such a preference, subsection b provides:

"Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable

cause to believe that the debtor is insolvent."

This action was tried by the court, and a pre-trial conference was held at which it was agreed that the case to be tried consisted of three issues:

1. Was Charles G. Rhodes insolvent, within the meaning of the Bankruptcy Act, on May 29, 1958, when the said mortgage given to National Surety Corporation was recorded in Lawrence County, Ohio, or on July 31, 1958, or August 4, 1958, when the $11,977.27 note was paid to National Surety Corporation?

2. Did defendant National Surety Corporation on May 29, 1958, or on July 31, 1958, or on August 4, 1958, have reasonable cause to believe that said Charles G. Rhodes was insolvent?

3. Was any money or funds of Charles G. Rhodes used, taken or applied directly or indirectly in making payment to said National Surety Corporation of the $11,-977.27 note and, if so, how much of his said money or funds?

In 1954 and 1955, Charles G. Rhodes perpetrated a fraud on the Huntington Federal Savings & Loan Association by forging the names of Glen C. Dowell and Norma L. Dowell on certain documents, which fraud resulted in a loss to Huntington Federal Savings & Loan Association in the amount of $11,977.27. Defendant National Surety Corporation, insurers of the Association, reimbursed it for the entire amount on March 24, 1958, thereby becoming subrogated to any claims of the Association against Rhodes. On May 28, 1958, Charles G. Rhodes and Maybelle C. Rhodes, his wife, executed and delivered to National Surety Corporation a note in the amount of $11,977.27. This note was back dated to March 26, 1958, so that interest on the note would commence on that date, March 26 being the date National Surety discharged its obligation to the Association.

Also on May 28, 1958, Charles and Maybelle Rhodes gave a mortgage on certain Ohio property owned jointly by them as tenants in common, as security for the note. The mortgage was recorded on May 29, 1958. This constituted the third mortgage on the property. The first mortgage was for $20,000 and the second for $6,500. Both of these prior mortgages were in the name of Charles G. and Maybelle C. Rhodes. Charles F. Bagley, of the law firm of Campbell, McNeer, Woods and Bagley, represented National Surety Corporation in the transactions involving the third mortgage.

The Ohio property was sold at auction on July 15, 1958, for approximately $58,000. After various expenses of the sale were paid, about $53,000 remained. Of this amount, $38,477.27 was used to pay off the above-mentioned first, second and third mortgages. Approximately $14,000 of the remainder was used to clear up personal obligations of Charles G. Rhodes. The third mortgage, to National Surety Corporation, was paid off in two separate checks, dated July 31, 1958, and August 4, 1958, respectively.

An involuntary petition in bankruptcy was filed against Charles G. Rhodes on August 18, 1958, in the United States District Court for the Southern District of Ohio, at Cincinnati, the petition resulting in Rhodes being adjudged a bankrupt in October of 1958, he having admitted his bankruptcy.

At the February, 1958, term of Common Pleas Court of Cabell County, West Virginia, Rhodes was indicted for grand larceny and forgery on unrelated matters. The Huntington newspapers gave the matter extensive coverage. Also in February of 1958, the landlord of the business property in Huntington, West Virginia, rented to Rhodes, had a warrant of distress issued against all of his office furniture, the amount due on the rent being $900. The office furniture was sold in February, 1958, netting $600. The landlord in this proceeding was represented by the law firm of Campbell, McNeer, Woods and Bagley. Mr. Woods of this firm was retained in March, 1958, to represent the defendant National Surety Corporation in this case. At the June term of the Common Pleas Court of Cabell County, West Virginia, Rhodes

was indicted in connection with several misappropriations of moneys.

■■ The first issue presents little difficulty. Section 1 of the Bankruptcy Act, 11 U.S.C.A. § 1, under subsection (19) states that,

"A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts;"

The evidence is uncontradicted that the only asset worth mentioning, that Rhodes owned at the time of the transactions in question, was the Ohio property. The evidence is also uncontradicted that during the period in question, he owed money far in excess of the worth of that property. The evidence showing insolvency need not be direct. In Rosenberg v. Semple, 3 Cir., 1919, 257 F. 72, 73 the court states:

"But direct and detailed evidence of the facts constituting insolvency is not essential. Owing to its nature, insolvency is not always susceptible of direct proof. It may, and in many cases must, be proved by the proof of other facts, from which the ultimate fact of insolvency may be presumed or inferred."

Within the meaning of the Bankruptcy Act, Rhodes was insolvent during the period at issue in this case, as his aggregate property was not sufficient to pay his debts.

■ As to the second issue, a more difficult problem is raised. Prior cases are of little help in deciding the question of "reasonable cause." This point is well set out in Watchmaker v. Barnes, 1 Cir., 1919, 259 F. 783, 786, where the court reasoned that,

"What will constitute reasonable cause for belief under the Bankruptcy Act has been considered many times in both federal and state courts, but it is evident that no general rule could be laid down which would apply to every case, but that each must be decided upon its own facts and the circumstances surrounding them."

■ In view of the newspaper accounts of the financial manipulations and difficulties of Rhodes, and the uncontradicted testimony that it was general knowledge in the community that he was involved in financial difficulties, plus the fact that the agent of defendant, Bagley, had acted as counsel for Rhodes' landlord in the matter of the distress warrant in February of 1958, and other evidence in the record, it is the finding of this court that the agent of National Surety Corporation, Bagley, did have reasonable cause to believe Rhodes to be insolvent during the period in question.

■ Is this knowledge of the agent to be imputed to the principal? Exactly in point is the case of Rogers v. Palmer, 1880, 102 U.S. 263, 26 L.Ed. 164, where it was clearly held by the Supreme Court that the attorney, when directly employed to collect a debt, becomes the agent of the collector, and any knowledge of the attorney is imputable to the creditor. The question is also answered by 11 U.S.C.A. § 96, sub. a quoted above, where it is expressly stated that a preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby, or his agent acting with reference thereto, has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Bagley, the agent of the defendant, admitted that he was familiar with the newspaper accounts of Rhodes' activities during the early part of 1958. (These newspaper accounts are in evidence.) He also stated that he was acquainted with Rhodes because of church affiliations.

"In determining what constitutes 'reasonable cause', it is well settled that notice of facts which would incite a man of ordinary prudence to an inquiry under similar circum-

stances is notice of all the facts which reasonably diligent inquiry would have disclosed." Marks v. Goodyear Rubber Sundries, Inc., 2 Cir., 1956, 238 F.2d 533, 534, 62 A.L.R.2d 770.

In McElvain v. Hardesty, 8 Cir., 169 F. 31, it was held that the circumstances of the creditor receiving all the property of the debtor as security was a circumstance that could be considered in determining whether or not the creditor had reasonable cause to believe that the debtor was insolvent. It has been held that the taking of a chattel mortgage on all the debtor's stock in trade is an inference as to the creditor believing the debtor was insolvent. Swanson & Sons Poultry Company v. Wylie, 9 Cir., 237 F.2d 16.

■ Thus, National Surety Corporation had reasonable cause to believe that Rhodes was insolvent on all of the dates listed in the second agreed issue.

■ The next issue concerns the ownership of the money used to pay defendant. Ohio substantive law will control in making this determination, as to the relationship created in the deed granting the Ohio property to Charles G. and Maybelle C. Rhodes, and the ownership of this property.

■ The bankrupt and his wife owned the land as tenants in common. In re Hutchison's Estate, 1929, 120 Ohio St. 542, 166 N.E. 687. This means that each had an undivided one-half interest in the property, and either or both could sell this interest to a third party. Farmers & Merchants National Bank v. Wallace, 1887, 45 Ohio St. 152, 12 N.E. 439. There is no right of survivorship in this type of ownership. In re Hutchison's Estate, supra.

The record indicates, and reason dictates, that Waldo, the Ironton attorney who handled the sale of the Ohio property, paid off the three mortgages against the property prior to paying off any personal indebtedness of Charles G. Rhodes.

Bagley, who had represented National Surety Corporation in the matter of obtaining payment from Rhodes, was told by Waldo that he would hold the proceeds of sale, pay off the three mortgages, and then turn the balance of the proceeds over to Charles G. Rhodes and Maybelle C. Rhodes. It is a fair inference from the evidence that Maybelle C. Rhodes took little part in the arrangements, and that Waldo was authorized to distribute the balance in his hands, after payment of the mortgages, as Charles G. Rhodes directed, and that the money was so disbursed.

Buyers of the Ohio property were informed by Waldo that no deeds would be delivered until he had received enough money in payment for the property to pay off the three mortgages against it. Thus, it would have been both wrong and illogical for him to have paid money to any source, prior to discharging the three mortgages. The purchasers were directed to make all payments to Waldo, and he was to use that money to pay off the three mortgages and then deliver the deeds to the purchasers.

After expenses, the proceeds of the sale amounted to approximately $53,000. Thus, as tenants in common, Rhodes and his wife should each have been entitled to $26,500. The first, second and third mortgages were paid, amounting to $38,477.27. These were joint debts of both Charles G. and Maybelle C. Rhodes, and were paid with the money of both. There now remained $14,522.73, one-half of which belonged to each of these two parties. This naturally follows from the fact that each tenant in common would be entitled to his proportionate share of the proceeds from the sale of the property held in common. All of this balance from the proceeds of sale, with the approval of both Charles G. and Maybelle C. Rhodes, was used to pay off personal debts of Charles G. Rhodes, with the exception of about $700, which was turned over to Charles G. and Maybelle C. Rhodes. In Jones v. Marsh, 6 Cir., 1955, 226 F.2d 622, the Circuit Court of Appeals, in affirming the District Court, stated:

"The district court, approving the findings and conclusions of the Ref-

eree, held that the bankrupt was the owner of an undivided one-half interest in the property, * * * The court accordingly held that the trustee was entitled to have sold the bankrupt's undivided one-half interest for the benefit of creditors."

Considering the third mortgage, there seems to be no good reason why it should be treated on a different basis from the first two. It, like the others, constituted a joint and several liability as to both Rhodes and his wife. Therefore, it follows naturally that the third mortgage was paid by both Charles G. and Maybelle C. Rhodes.

It would seem significant at this point to mention that Maybelle C. Rhodes was not called as a witness in this case. Defendant claims that she provided all the money to pay off defendant's mortgage, and that none of the money of Charles G. Rhodes was used for such purpose, and that she did not consent to any of her money being applied to the payment of her husband's personal debts, and it was not so applied. It is also significant that Waldo, the trustee, was not called as a witness to show that there was any different arrangement in the payment of the third mortgage than the payment of the first two mortgages. Maybelle C. Rhodes should be very much interested in the outcome of this case, because if the plaintiff prevails she is still liable on the note to the Surety Company for the amount of any established preference which the Surety Company would be required to pay. If the Surety Company debt was paid in full by her with her money, as defendant contends, no one would better know this fact than Waldo and Maybelle C. Rhodes.

Plaintiff urges that Charles G. Rhodes was the owner of all the Ohio property, and that the third mortgage was paid in full with his money. The burden of proof is upon plaintiff to prove such fact and, in my opinion, plaintiff has failed in this respect. In addition to the evidence mentioned above, there was evidence that the Ohio real estate was paid for out of proceeds of the sale of other real estate in Huntington, West Virginia, jointly held by them, and that the Huntington real estate was acquired through the sale of other property jointly held by them, and so on back to about 1945 or 1946, when property was put in both of their names, as was customary, although the money to pay for same came from his personal earnings; that title to his Cadillac car purchased in the last two years was put in his wife's name; that he had purchased an International tractor for use on his Ohio property and claimed that the tractor belonged to his nine year old daughter; and other evidence to the effect that he had treated the property as his own.

The conclusion of this Court is that one-half of the amount of the mortgage, or $5,988.63, constituted a preferential transfer by Charles G. Rhodes, and this transfer should be set aside and the amount of $5,988.63 returned to the trustee in bankruptcy.

This opinion is adopted as the findings of fact and conclusions of law of this Court. Counsel for plaintiff may prepare an order according to the views expressed herein.